WIGGLESWORTH (UNITED STATES v.). See Case No. 16,690.

---

## Case No. 17,628.

### WIGHT et al. v. CURTIS.

[11 Hunt, Mer. Mag. 553.]

Circuit Court, S. D New York. 1845.

CUSTOMS DUTIES—DAMAGED GOODS—APPRAISEMENT AND SURVEY—AUTHORITY OF COLLECTOR — REFUSAL OF APPRAISEMENT.

1. No act of congress having designated any form or mode of proof to be made, of damage to goods on the voyage of importation, to lay the foundation for an appraisement, the collector is bound to order it on reasonable evidence of such damage. If he does not object to the form of proof when presented, he cannot raise such objection at the time when sued for not calling such appraisement. A request to the collector to have an appraisement by merchants, appointed pursuant to the act of 1799 [1 Stat. 627], is to be regarded an application to have it made according to the existing law.

2. The 52d section of the act of March 2, 1799, does not require a survey of goods, damaged on the voyage of importation, to be made previous to an appraisement of damages for the purpose of an abatement of duties. If such survey is necessary, the master and wardens of the port are not "the proper officers," within the meaning of the act to make it.

3. After a collector has ordered goods to a public store, because of damage on the voyage of importation, he has no authority to require a survey of such goods, in order to their appraisement.

4. When an appraisement is refused, the deterioration of the goods may be proved by witnesses; and the collector is liable, in an action for damages, to pay the difference between the duties exacted by him, and those the goods ought to have been charged with.

[This was an action by Edward Wight, William Sturgis, and William Shaw against Edward Curtis. to recover back 60 per cent. of certain duties paid under protest.]

BETTS, District Judge. In the decision of this case, I shall forbear the review of several topics, discussed with great fulness and learning. Under the construction I give the 52d section of the act of 1799, it does not become necessary to consider the origin of the powers of the port-wardens of this port, or the just extent of those powers under the statutes of the state, or the conveniency or fitness of the usage prevailing with the custom-house here, to call for their official certificates in cases of goods damaged on the voyage of importation, for which a deduction of duties shall be claimed; nor to investigate and determine the right of marine surveyors. under private appointment, to perform that service.

The facts presenting the question in contestation between the parties, are, that the ship Sheffield, when coming into this port in November, 1843, and in charge of a pilot, grounded in a heavy wind, and filled and sunk. She was subsequently raised, and towed to the city, and her cargo unladen; and, by consent, and at the instance of the parties interested, it was ordered by the collector to be deposited in a public store-house. The dutiable goods of the libellants, on board the ship, were damaged by sea-water on the occasion, to the amount of 60 per cent. on their value. The libellants produced certificates of the port-wardens of surveys of all their packages, except one; and asked, and had allowed them by the collector, an appraisement of the damages so incurred by those packages. In respect to the package in question, the libellants offered to the collector the sworn survey and appraisement of Alexander Cartwright (representing himself to be a person "selected by the parties interested, to survey, appraise, arbitrate, and judge of vessels and goods arriving damaged, or becoming damaged in the port of New York"), certifying that he had taken a strict and careful survey of the goods in question, and found them to have been damaged on the voyage of importation. Also, the deposition of the master of the ship, proving the wreck, and injury to the cargo in consequence. An exception was taken, on the argument. to the admissibility of this deposition, because the attestation was taken before a state magistrate, not authorized to administer oaths to be used in the United States tribunals. I think this objection cannot prevail; for the attestation on oath, to such a document, is not required by any act of congress; and if it had been, the collector should have refused to receive the affidavit, because of defect of authority in the officer taking the oath, so that the irregularity might have been rectified at the time: and he cannot be permitted to start the objection on the final argument. This acceptance of the deposition will be deemed a waiver of any informality in the jurat. particularly as the paper was addressed to him, and was to have no other operation than to guide the decision on the claim of the importer to have his goods appraised.

The collector, by his letter of November 23, 1843, to the plaintiffs, stated that, according to the instructions which he had received from the secretary of the treasury, the certificate of damage must be given by a port-warden; and added "that, if within ten days after the landing of the goods, such certificate shall be presented, orders will be given for an appraisement." The particular certificate not being furnished, the appraisement was refused, and the libellants paid the full duties charged ($103.14) on this package, making their protest at the time, and then brought this action in a state court. to recover back 60 per cent. thereof (being $67.05), with interest from November 25, 1843. The action was removed to this court pursuant to the act of congress of March 3. 1833,—8 Laws [Bior. & D.] 792. § 3 [4 Stat. 633]. A letter of the secretary of the treasury, dated July 13, 1843,

to the collector, ratified his decision in a previous case, rejecting the certificate of damage given by the marine surveyors appointed by the chamber of commerce and board of underwriters of the port of New York, and approved the practice of requiring the certificate of damage to be given by the port-wardens, as not only in accordance with the fifty-second section of the act of 1799, but as that which most nearly conforms with its provisions. Some criticism was addressed on the argument, to forms of the proofs of damage; and their sufficiency to establish the fact was questioned; but, as the objection on the trial referred essentially to their admissibility, and the fact and extent of damage was not made a prominent point, I shall regard the testimony, if competent, sufficient to have justified the jury in finding for the plaintiffs; and the court, on a case made, will draw the same inferences from the evidence that a jury would be warranted in drawing. 14 Johns. 215; 15 Johns. 409; 6 Cow. 632. It was also suggested that the collector rightfully refused the request of the plaintiffs, because they asked the appointment of merchant appraisers, conformably to the act of 1799, when the act of 1823 had abolished that mode of appraisement, and designated official appraisers, who alone possessed authority to make this appraisement. This was clearly a mere misapprehension in the form of application—a mistake which the collector did not regard; for he avowed his readiness to act under the application, on being furnished the particular certificate he required; and, accordingly, the error of the plaintiffs, in the designation of the appraising officers, can stand in no way against their rights in the matter. The court will regard it as the collector did—a request to have the appraisement made conformably with the law.

The essential question to be disposed of is, then, whether the plaintiffs, on the facts and circumstances of this case, were bound to produce a certificate of the port-wardens before an appraisement and a deduction of duties, because of such damages, could be claimed by them. This inquiry turns upon the construction to be given the 52d section of the act of March 2, 1799. It enacts that "all goods, wares, or merchandise, of which entry shall be made incomplete, or without the specification of particulars, either for want of the original invoice or invoices, or for any other cause, or which shall have received damage during the voyage, to be ascertained by the proper officers of the port or district in which the said goods, wares, or merchandise shall arrive, shall be conveyed to some warehouse or storehouse, to be designated by the collector, in the parcels or packages containing the same; there to remain, with due and reasonable care, at the expense and risk of the owner or consignee, under the care of some proper officer, until the particulars, cost, or value, as the case may require, shall have been ascertained, either by the exhibition of the original invoice or invoices thereof, or by appraisement, at the option of the owner, importer, or consignee, in manner hereafter provided; and until the duties thereon shall have been paid, or secured to be paid, and a permit granted by the collector for the delivery thereof. And for the appraisement of goods, wares, and merchandise, not accompanied with the original invoice of their cost, or to ascertain the damage thereon received during the voyage, it shall be lawful for the collector, and, upon request of the party, he is required, to appoint one merchant, and the owner, importer, or consignee, to appoint another, who shall appraise or value the said goods, wares, or merchandise, accordingly; which appraisement shall be subscribed by the parties making the same, and be verified on oath or affirmation, before said collector—which oath or affirmation shall be in the form following, to wit," &c., &c. The usage at the customhouse, under this section, has always been, to exact a certificate preliminarily to ordering an appraisement on damaged goods; and the wardens of the port have been held "the proper officers" to give such certificates. On the part of the plaintiffs, it is contended that the act supplies no authority for either of these requirements. The section recited directs goods, wares, and merchandise, to be conveyed to some warehouse or storehouse, on arriving in port, in either of two conditions:—First, when the entry of them shall be made incomplete, for any cause; and, second, when they "shall have received damage during the voyage, to be ascertained by the proper officers," &c. In the first instance, it is plain, the collector acts on his own view of the state of the entry, and without any extraneous evidence; but as, in the second instance, the cause for ordering the goods to a public store would not be apparent on the entry, or one which the collector would be supposed prepared to decide on his own inspection, there would seem to be the occasion for designating by law the circumstances which would require or authorize the order. This designation is supposed to be supplied by the statute. The terms employed in the act may probably admit this construction; and if the first clause is read by itself, such might be its more natural interpretation, because the inquiry which is to lead to the action of the collector is, whether the goods have received damage during the voyage; and the expression, "to be ascertained by the proper officers," might well be regarded as having reference to the general proposition or idea of damage during the voyage, and not to damage simply in respect to its amount or extent. But the same expression is again taken up in the subsequent clause of the section; and congress, by the application of it there, would seem to regard the language as calling for a valuation of damages, and not merely the finding of the fact that damage had been received. This understanding of its import is again distinctly indicated in the form of the oath; for the appraisers are required to swear that "the

packages have received damage, as we believe, during the voyage of importation; and that the allowance by us made for such damage is, to the best of our skill and judgment, just." It is not to be supposed that congress would, in this clause and the oath, impose on appraisers the duty of ascertaining the fact of damage during the voyage, if, by the previous clause, other officers were appointed to perform that very service; and it seems to me that the entire section, taken with the form of oath, denotes that it was intended to provide for no more than one ascertainment of damage in this behalf; and that, in this respect, the first clause in the section is to be considered subordinate to, or more completely fulfilled by the subsequent one. Although the language may be susceptible, and most naturally, of the interpretation given it by the collector, and the secretary of the treasury, yet plainly no violence is done it, by understanding it in the other sense; and the latter would most effectually harmonize all the provisions of the section. In aid of this exposition, it is to be observed that the language is prospective, having relation to an act afterwards to be done, and that not necessarily before the action of the collector, in ordering the goods to a public store. "Damage to be ascertained," and "to ascertain the damage," are correlative expressions, and indicate one and the same procedure: and that they are so used by congress, is plainly imported by the terms of the oath, "to ascertain and appraise the damage." This latter act must necessarily follow the deposit of the goods in a public store; and the language of the first section may very well be satisfied, even on the interpretation of the defendant, by having the survey posterior to the deposit in store. If, then, this ascertainment of damages by proper officers must not indispensably be had, previous to the deposit of the goods, and as the statute having provided for only one proceeding therein, subsequent to such deposit, the entire section would most appropriately be read as having reference to the one act of ascertaining and appraising, designated and directed in the latter clause.

I think, therefore, that, upon the true construction of the fifty-second section, the damage received during the voyage, to be ascertained by the proper officers of the port or district, mentioned in the first clause, is the same matter directed to be inquired into and determined in the after branch of this section; and that, accordingly, there is no authority in the act for requiring any other survey or appraisement. A more minute analysis of the terms of the section will conduce to the support of this construction. If the provisions of the first clause call for a survey of the goods, by proper officers, as it is understood at the custom-house it stands in singular contrast with the after provision in that respect, in not naming the officers who are to perform the duty; in not exacting the sanction of an oath from them; and

in not rendering it obligatory on the collector to take the proceedings. The importer is supplied with no authority to compel the action of the collector; and if the first branch of the section is read as complete within itself, it would seem that the merchant is placed entirely at the discretion of the collector, or can have no relief because of his refusal to call a survey, and the consequent deterioration of his property, unless through the tedious and precarious prosecution of the collector, for malfeasance in his office. Congress deemed the matter worthy of precise legislation, when they came to consider the equitable consequence of such injury to goods, on the rights of the importer and the interests of the revenue; and provided specifically for enforcing and preserving their respective interests, by clear and precise enactments in the after branch of the same section. Such incongruity would be reluctantly implied in the provisions of the same section; and the construction, therefore, which regards the whole subject-matter one and the same, and as provided for in a common regulation, seems best adapted to uphold the rights of all parties, and fulfil the purposes of congress. This same course is pursued in the 60th section, in relation to vessels coming into port in distress. The regulation is minute and specific, in the description of the officers who may make surveys, and as to the time and manner in which kindred services are to be obtained and rendered; and, whether state officers or merchant appraisers are employed, the act points out definitely when and how they are to act. This latter section supplies also a forcible argument against the application of the term "proper officers," used in the fifty-second section, to port-wardens; because it names them, or calls for other state officers, "usually charged with, and accustomed to ascertain the condition of ships or vessels arriving in distress." It is not to be supposed, if congress adopted in the previous section "port-wardens," under the general appellation of "proper officers," as well known to possess and exercise within the states the functions there called for, that in legislating further, on like subject-matters, they would, in the 60th section, name them specifically, or describe the qualifications of the other officers who might be used. But it is to be remarked that the term "proper officers" is twice used in the same paragraph of the 52d section; and, in the latter case, must necessarily refer to some custom-house officer, or one appointed under the authority of the revenue laws, because he is officially to take care of the goods ordered by the collector to be taken in store.

It is not unworthy of observation, that the phrase, "proper officers of the port or district in which the goods, &c., shall arrive," does not apply to any public officers known to the laws of this state at the time the act of congress was passed; nor is it probable that

such officers were created in any of the other states. The powers of port-wardens do not, under the colonial or state statutes, extend beyond the port of New York (Act March 7, 1759; 2 Smith & Livingston, 160; Act 14th April, 1784, 1 Greenl. 86), whereas the district of New York was, by the fifth section of the act of congress of March 2, 1799, as it had been by the act of July 31, 1789 [1 Stat. 29], made to embrace nearly all the coasts, rivers, bays, and harbors of the southern part of the state, including those on the North river. The city of New York is, in the act of 1789, and all subsequent ones, made the port of entry; but it is manifest that there must be officers created under the acts whose powers extend over the entire district. It may be as important to have proper officers of the revenue in other harbors on the coast within the district, to take care of goods deposited there by the collector, as in that of New York; and it may become of equal importance to have appraisements made at such places, because the whole regulation has reference to wreck or disasters at sea, and will necessarily be ample enough to meet the exigencies that are likely to rise in this behalf, in every part of the district.

Again: the argument in favor of construing the 52d section, so as to have the expressions "proper officers of the port or district" apply to port-wardens, rests upon the assumption that that class of officers notoriously possessed and exercised, under the state laws of the different states, the power of making surveys of goods alleged to be damaged on the voyage of importation, and determining the fact whether such damage has been received. There may be ground to doubt the entire correctness of this assumption. By the colonial act of March 7, 1759, § 9, the master and wardens of the port of New York, for the time being, are appointed surveyors, for surveying of all damaged goods brought into the said port in any ship or vessel; and in like manner, with the assistance of one or more able carpenters, to survey all vessels deemed unfit to proceed to sea, &c. 2 Livings. & Smith, 163.

An act was passed September 11, 1761, with a preamble that "whereas goods imported here, and insured in Great Britain, and elsewhere abroad, are sometimes sold in this city for the account of the insurers, and some persons, taking the advantage of their absence, have frequently made fraudulent sales, to the great prejudice of the insurers, the undue gain of the assured, and detriment of the commerce of this colony; for a remedy therefor, it is enacted, that hereafter, all damaged goods be sold for account of the insurers shall be surveyed by the master, or one or more of the wardens of the port of New York for the time being, and such sale shall be made in his or their presence," &c., &c. Van Schaick's Laws N. Y. 394. This act was continued in force to January 1, 1775. Id. 498. If this act is to be re-

garded as suspending or superseding that of 1759, during its continuance, on its expiration, the latter probably revived; and, under the 35th article of the state constitution of April 20, 1777, continued in force until the passage of the act of April 14, 1784, by the state legislature. The 8th section of the latter act is a re-enactment of the 9th section of the act of 1759, above recited. Jones & Vorick, Laws N. Y. 122; 1 Greenl. 89. The latter law, in substance, was continued under the various revisions of the statutes, till a revision and consolidation of the laws on this subject, by the act of February 19, 1819. 5 Laws N. Y. 11. By the 5th section of the act, it is enacted that the master and wardens of the port of New York, or any two of them, with the assistance of one or more skilful carpenters, shall be surveyors of any vessel deemed unfit to proceed to sea, &c., &c.; and in all cases of vessels and goods arriving damaged, and by the owner or consignee required to be sold at public auction, on account of such damage, and for the benefit of underwriters out of the city of New York, such sale shall be made under the inspection of the master and wardens, or some or one of them; which master and wardens shall, when required by the owner or consignee aforesaid, certify the cause of such damage, &c.; and an after clause gives them $1.50 fees "for each and every survey on board of any ship or vessel, or at any store, or along the docks of the city of New York, on damaged goods," &c. This is, in substance, a re-enactment of the provisions of the colonial law of 1761, above recited; and the language of the section clearly indicates that it was based upon like reasons—and, as the existing law of 1784 must necessarily have been in view of the legislature, the implication is strong, if not conclusive, that the latter act was intended to limit the authority of port-wardens, in making surveys of damaged goods, to the single case therein designated. I am aware the vice-chancellor in this circuit has put a certain construction upon the act of 1819, and has held, from the grant of fees for surveys on damaged goods, that the intention of the legislature to make the powers of port-wardens as they had been under the act of 1784, is to be implied. This decision, it is understood, is in course of review before the chancellor, and it is not, therefore, to be regarded as authoritative on the point; and, with great respect for the learning of the distinguished judge who pronounced the opinion referred to, I think it must be at least matter of doubt whether so important an interpolation to the act of 1819 can be authorized, upon the presumption afforded by the mere grant of fees, and when also that provision may be reasonably satisfied by applying it to the particular surveys designated by the section. It is enough, however, in the case before me, to say that it is not made clear, upon the laws of this state, that the port-ward-

ens are now possessed of authority to make surveys on all damaged goods brought into this port in any vessels, and certify the cause of such damage; and that, accordingly, if congress intended to refer this service to state officers, the defendant fails to show that the port-wardens are "the proper officers of the port or district," competent to perform such services. But it is to be furthermore observed that, on the construction of the 52d section, contended for by the defendant, a preliminary survey and certificate by port-wardens can only be necessary for the purpose of guiding his discretion in ordering the goods to be deposited in a warehouse or storehouse. It is not urged that the port-wardens have any authority to ascertain and appraise the damage; and there is nothing in the section importing that after the collector, for either cause indicated therein, has commanded the deposit of goods, that he can do less or more, respecting them, than pursue the precise directions of the act. The act is express and explicit in declaring that, when the condition exists requiring the goods to be conveyed to a warehouse or storehouse, they shall remain there until the particulars, &c., shall have been ascertained, in the manner afterwards provided in the same section.

It seems to me clear, therefore, that if the collector might, under the act, exact the certificate of a proper officer on survey of the goods, before he would order their deposit in public store, because of damage incurred on the voyage of importation; yet that, if he acts upon the assumption of such damage, and orders the deposit for that cause, he is then bound to proceed, and have the damage ascertained and appraised by the public appraisers; who, by the act of 1823, supercede in this behalf the authority of merchant appraisers, referred to in the 52d section. I am, accordingly, of opinion that the plaintiffs are entitled to judgment on this verdict.