PHILIP GREELY, JUNIOR, PLAINTIFF IN ERROR, *v.* WILLIAM THOMPSON AND WILLIAM HENRY FORMAN, MERCHANTS AND COPARTNERS, TRADING UNDER THE STYLE AND FIRM OF THOMPSON AND FORMAN, ALIENS AND RESIDENTS OF LONDON, DEFENDANTS.

In an action brought against a collector for the return of duties paid under protest, it was not competent for him to give in evidence a letter from the Secretary of the Treasury, to show that the removal of one of the merchant appraisers was done by his order.

The legality of such removal as to third persons was valid or not, according as the collector possessed legal power to make it on the facts of the case. Courts must

look to the laws themselves, and not to the constructions placed upon them by the heads of Departments, although these are entitled to great respect, and will always be duly weighed by the court.

Under the various acts of Congress providing for the payment of duties, the time of procurement is the true time for fixing the value, when the goods are manufactured or procured otherwise than by purchase, and are not of an origin foreign to the country whence they are imported hither. The proviso in the fifth section of the act of 1823 (3 Stat. at Large, 732), relates altogether to this latter class of goods.

The penalty provided in the act of 1842 related only to goods purchased, and not to goods procured otherwise than by purchase.

The regular appraisers and the merchant appraisers who may be detailed for the duty must, each one, personally inspect and examine the goods. It will not do for one to report to the other that the goods are " merchantable," and then to fix the value according to a general knowledge of the value of merchantable goods of that description.

The removal, by the collector, of one of the merchant appraisers, because he wished time given to obtain more evidence from England, and the substitution of another, was irregular, and made the whole appraisement invalid. These appraisers are temporary umpires between the permanent appraisers and the importers, and after entering on their duties could not be removed, either by the collector or Secretary, without some grave public ground beyond a mere difference of opinion.

THIS case was brought up, by writ of error, from the Circuit Court of the United States for the District of Massachusetts.

Mr. Justice Catron did not sit at the trial in this court, being a stockholder and copartner of a railroad company having a similar interest.

It was argued in conjunction with the ensuing case of Maxwell *v.* Griswold et al. Mr. *Crittenden* (Attorney-General) covered both cases in his opening argument; Mr. *Sherman* replied in this case, and Mr. *McCulloh* in Maxwell *v.* Griswold, when Mr. *Crittenden* concluded with a reply applicable to both cases. It is difficult, therefore, to separate the arguments, although each case will be stated separately.

It was an action of assumpsit brought by Thompson & Forman, merchants in London, to recover back from Greely, the collector of the port of Boston, an excess of duty and penalty paid to him as collector under protest.

The bill of exceptions stated all the material facts in the case, which were as follows.

### Bill of Exceptions.

This was an action of assumpsit brought by the plaintiffs, merchants in London, England, against the defendant, the collector of the port of Boston, to recover back the sum of $ 6,282.37, with interest thereon ; said sum being the amount of the additional duty and penalty alleged by the plaintiffs to have been illegally exacted by the defendant, in his capacity aforesaid, upon a cargo of railroad iron imported by the plaintiffs into said port of Boston, in the manner and under the circumstances below stated, and which said sum was paid under protest.

Upon the trial of said cause before the jury, after issue joined, it was shown in evidence that the plaintiffs were manufacturers of railroad iron in Wales, and resided in London, England; that through their agents in Boston, Messrs. William F. Weld & Co., they contracted to sell certain railroad iron to the Fitchburg and Worcester Railroad Company, and to deliver it in Boston; that they made the rails ready for shipment in Newport, Wales, and chartered a vessel for the transportation of said iron to Boston, on the 24th of January, 1849; that the lading of the vessel was completed on the 24th of February following, on which day the bills of lading and invoices were dated, and the vessel sailed.

The invoice, duly made and authenticated, as the act of Congress requires, fixed the value of the iron at five pounds per ton, which was proved to be the fair market price at that date, to wit, on the said 24th day of January; that on the arrival of the vessel in Boston in April of the same year, the iron was entered, and the duties paid according to the invoice; that before the iron was removed, the appraisers at the customhouse, acting under general orders from the Treasury Department, appraised the iron at six pounds per ton, taking the date of the invoice and bill of lading as the time when the value should be fixed, to wit, the 24th of February, 1849, the price having materially advanced during the previous thirty days; that the plaintiffs appealed from this appraisement, and gave notice thereof to the defendant, who, in supposed pursuance of statute provisions in such cases, appointed two merchants, viz. Peter Harvey and Charles Thompson, to make a valuation of the iron according to the provisions of the laws of Congress, as construed by the Secretary of the Treasury, and they took the following oath.

> " *Custom-House, Boston,*
> *Collector's Office, April* 14, 1849.

" We, the undersigned, appointed by the collector of Boston and Charlestown to appraise a lot of railroad iron, imported per Abellino, from Newport, Wales, the said importer having requested a new appraisement thereof, in accordance with the provisions of the sixteenth and seventeenth sections of the act of the 30th of August, 1842, do hereby solemnly swear (or affirm) diligently and faithfully to examine and inspect said lot of railroad iron, and truly to report, to the best of our knowledge and belief, the true value thereof, in accordance with the provisions of the laws of Congress, as construed by the Secretary of the Treasury, in several instructions issued by him, in pursuance of the authority vested in the said Secretary of the

Treasury, by the twenty-third and twenty-fourth sections of said act of 30th August, 1842, by the act of 30th July, 1846, and the second section of the act of August 10th, 1846.

PETER HARVEY,

CHARLES THOMPSON.

" April 14, 1849, before me,

MARCUS MORTON, *Collector.*

" A true copy.    Attest :

I. O. BARNES, *Clerk.*"

One of these merchant appraisers, viz. Peter Harvey, doubting whether the invoice was too low, and thinking that it was due to the plaintiffs that they should have time and opportunity to furnish evidence from England, as to the true market value of the iron, reported this to the collector in order that time might be given ; that thereupon this merchant was removed by the collector, and another, viz. Flavel Mosely, was appointed by the collector in his place, who took the same oath which is mentioned above as having been taken by Harvey and Thompson ; that these merchant appraisers, viz. Thompson and Mosely, thus constituted, valued the iron at five pounds and fifteen shillings per ton, taking, in obedience to instructions from the Treasury Department, the 24th of February as the time when the valuation should be made; that this value so appraised being more than ten per cent. above the invoice value of the iron, the defendant exacted a duty of thirty per cent. on the amount which had been added to the invoice, and, in addition, a penalty of twenty per cent. on the appraised value ; that the additional duty and the penalty amounted to $ 6,282.37, which sum, with interest so paid, the plaintiffs sought to recover back in this action ; that this sum above mentioned was paid under protest by the plaintiffs; that the custom at the port of Boston was to fix the value of the imports at the date of the invoice or bill of lading ; that one of the custom-house appraisers did not inspect or see the iron, as it did not fall in his division (i. e. the two appraisers divide the labor, one taking one class of goods, and the other another class, and it was not the work of that appraiser who did not examine the iron to appraise that class or kind of goods) ; that only one of the merchants who finally acted as merchant appraisers ever saw the iron ; but that the said Mosely testified that the other appraiser, Thompson, and also Harvey, had seen it, and that the kind of iron was admitted, and that it was merchantable, without saying by whom ; that it was not necessary for him to see the iron to give it its value, but that he could, when its quality was stated to him, fix its value ; and that he could and did in this way fairly appraise the value of such iron.

Greely v. Thompson et al.

The merchant appraisers made the following return, viz.: —

"*Boston, May* 18, 1849.

"SIR, — We have examined the following merchandise imported by William F. Weld & Co., in the Abellino, from Newport, valued in the invoice at £ 4,720 0s. 10d., but which we are of opinion could not have been purchased at the time and place of exportation for less than £ 5,428 0s. 11d.

"In conformity, therefore, with the provisions of the sixteenth and seventeenth sections of the tariff act, approved August 30, 1842, we do appraise the said merchandise as follows, any invoice or affidavit thereto to the contrary notwithstanding.

| Marks. | Numbers. | Description of Merchandise. | Value. |
|---|---|---|---|
| | | 642 [3] bars railroad iron, weighing 920 tons 19 cwt. 2 qr. 23 lbs. at £ 5 15s. per ton, .. | £ 5,295 13 1 |
| | | Commission 2½ per . . . . . . | 132 7 10 |
| | | | £ 5,428 0 11 |

CHARLES THOMPSON,
FLAVEL MOSELEY,
*Merchant Appraisers.*

" To the COLLECTOR *of the District of Boston and Charlestown.*

" A true copy. Attest:
ISAAC O. BARNES, *Clerk, C. C.*"

The regular custom-house appraisers had appraised it at £ 6 per ton, making, with the commission, the amount of the invoice to be £ 5,664 1s. 2d.

The defendant offered to introduce a letter of the Secretary of the Treasury to the defendant, to prove that the substitution of the merchant appraiser, upon the delay of the first one to report finally, was done by the orders of the Treasury Department, but the letter was ruled out by the court.

The court instructed the jury, —

1st. That the date of the procurement of the iron in England or Wales, to wit, the 24th of January, was the time at which the appraisers should have fixed the value of the iron, and not the date of invoice and bill of lading, to wit, the 24th of February, when materially different.

2d. That if both appraisers, in each set of appraisers, did not make some personal examination of the iron, their report or decision was not made in conformity to law, and did not justify the penalty.

3d. That the valuation of the merchant appraisers was

invalid, because one of the merchants who made the appraisal was wrongfully substituted for another, to wit, the merchant appraiser who was turned out of office, or attempted to be, without any legal authority to do it on the facts of the case.

The jury found that the defendant did promise in manner and form as the plaintiff had declared against him, and assessed damages in the sum of $ 6,681.28.

To which ruling and instructions of the court, given as aforesaid, the said defendant at the trial excepted, and prayed this his bill of exceptions to be signed and sealed by the court.

All which being found true, the same is accordingly signed and sealed.

In testimony whereof I have hereunto set my hand and seal.

LEVI WOODBURY,    [SEAL.]
*Associate Justice of the Supreme Court, U. S.*

Upon this exception the case came up to this court.

It was argued by *Mr. Crittenden,* (Attorney-General,) for the plaintiff in error, and by *Mr. Sherman,* for the defendants in error.

*Mr. Crittenden* made the following points.

I. That the period of exportation from the foreign country is the true date, in contemplation of law, at which the value of imported articles subject to an *ad valorem* duty is fixed.

This question depends on the construction of the following statutes:—Section 16 of Tariff Act of 1842 (5 Stat. at Large, 563); section 8 of Tariff Act of 1846 (Session Laws, 43); section 2 of Appropriation Act of 1846; sections 8 and 10 of the Act of 1st March, 1823 (3 Stat. at Large, 735).

By the twenty-third section of the act of 1842 (5 Stat. at Large, 566) it is enacted, "That it shall be the duty of the Secretary of the Treasury from time to time to establish such rules and regulations, not inconsistent with the laws of the United States, to secure a just, faithful, and impartial appraisement of all goods, wares, and merchandise imported into the United States, and just and proper entries of such actual market value or wholesale price thereof."    Secretary Walker's Circular of 1st July, 1847 (1 Mayo, 364); another of 7th August, 1848; and another of 26th December, 1848.    Tucker *v.* Kane, decided in Circuit Court for Maryland District, in manuscript.

The act of 10th February, 1820, entitled "An Act to provide for obtaining accurate statements of the foreign commerce of the United States," in its tenth section, enacts, "That all articles imported shall be valued at their actual cost, or the values which they may truly bear in the foreign ports from

which they are exported for importation into the United States, at the time of such exportation." (3 Stat. at Large, 542.)

II. That the dutiable valuation of goods is the market value or wholesale price at the period of the exportation from the foreign country is manifest from the eighth section of the act of 1846, which makes it " lawful for the owner, consignee, or agent of imports which have been actually purchased, on entry of the same, to make such addition in the entry to the cost or value given in the invoice as in his opinion may raise the same to the true market value of such imports in the principal markets of the country whence the importation shall have been made, or in which the goods imported shall have been originally manufactured or produced, as the case may be."

III. That the invoice of the iron, dated 24th February, 1849, as follows: " Invoice of railway iron shipped at Newport, by Thompson and Forman, on board the Abellino, Captain C. H. Crozier, bound for Charlestown, Boston harbor, consigned to Messrs. W. F. Weld & Co., for account of the Fitchburg and Worcester Railroad Company," and the oath of Mr. Weld, made by him on making the entry, that the railroad company were the owners of the iron, show that the case came within the eighth section above mentioned, and that the provisions of that section were applicable to it.

IV. That the bill of lading and the invoice, in the latter of which the iron is valued at five pounds per ton, presented to the collector at the time of entry, are dated the 24th February, 1849, and that no evidence of the value of the iron on any other day is applicable, which shows that the value should be estimated at the time of exportation. Act of 1823, § 23 (3 Stat. at Large, 737).

V. That it is not necessary that all the official appraisers, or all the merchant appraisers, should have made a personal examination of the iron. Act of 1823, § 16 (3 Stat. at Large, 735); Act of 28th May, 1830, §§ 1 and 2 (4 Stat. at Large, 409); Act of 14th July, 1832, § 8 (4 Stat. at Large, 592); Act of 1842, §§ 16, 17, 21, and 22 (5 Stat. at Large, 563 et seq.). The seventeenth section is applicable to merchant appraisers.

VI. That the appraisement of the merchant appraisers was final. Act of 1842, § 17 (5 Stat. at Large, 564); Tucker v. Kane, above referred to.

VII. That the valuation was valid, being made by two merchants. Act of 1842, § 17; Treasury Circular of 26th December, 1848; Act of 1823, § 19 (3 Stat. at Large, 736).

VIII. That the action cannot be maintained by Thompson and Forman. Act of 2d March, 1799, § 62 (1 Stat. at Large, 675); Act of 26th February, 1845, § 1 (5 Stat. at Large, 727);

Independent Treasury Act of 1846, § 9; Meredith *v.* United States, 13 Pet. 486; Knox *v.* Devens, 5 Mason, 397.

*Mr. Sherman*, for the defendants in error, contended, —

I. That the appraisement was illegal and void, and did not justify the exaction of the additional duty and penalty imposed and paid, nor any portion thereof: —

1. Because the dutiable value of said iron, as fixed by law, was "the fair market value," or "actual value" thereof, "at the time and place when and where procured," or manufactured (with the dutiable charges added); and not its value at the time of exportation, as estimated by the appraisers; and that the proviso to the sixteenth section of the Duty Act of 30th August, 1842, under which the appraisers were directed, by circulars from the Secretary of the Treasury, to assume the date of exportation in fixing the value of all imports, applies only to goods, wares, and merchandise "imported into the United States, from a country in which the same have not been manufactured or produced"; and, therefore, did not apply to the iron in question, which was produced and manufactured in the country from which it was imported, and the actual value, or "fair market value" of which "when procured," is conceded to have been truly stated in the invoice and entry thereof.

Because both of the appraisers did not "examine and inspect" the iron, as the law and their oaths required, and as they alleged in their return they had done; and that to render an appraisement valid, either by public appraisers or merchant appraisers, both appraisers of either set of appraisers must have made some personal examination or inspection of the merchandise.

3. Because the merchant appraisers were not legally qualified, having taken an oath different from that prescribed by law, and one which bound them to make an appraisement in violation of law, by fixing the dutiable value of the iron at a period different from that prescribed by Congress; and because the merchant appraiser Moseley appears not to have been sworn at all.

4. Because the removal of the merchant appraiser Harvey, after he had been appointed, sworn, and entered upon the discharge of his duty, (and the substitution of another,) for having expressed doubts "whether the invoice was too low; and thinking that it was due to the plaintiffs that they should have time and opportunity to furnish evidence from England as to the true market value of the iron," and had "reported this to the collector, in order that such time might be given," was arbitrary and illegal.

Greely. *v.* Thompson et al.

Duty Act of 1st March, 1823, particularly §§ 4, 5, 7, 8, 16, 18 (3 Stat. at Large, 729); Duty Act of July, 1832, particularly §§ 7, 15 (4 Stat. at Large, 583); Duty Act of 30th August, 1842, particularly §§ 16, 17, 21 (5 Stat. at Large, 548); and Duty Act of 30th July, 1846, particularly § 11 (Schedule C) and § 8 (Session Laws, 1846; p. 68).

Reference will also be made, if necessary, to Duty Acts of 2d March, 1799 (1 Stat. at Large, 644); of 20th April, 1818 (3 Stat. at Large, 433); of May, 1828 (4 Stat. at Large, 570); and of 28th May, 1830 (Ibid. 409).

Tracy and Balestier *v.* Swartwout, 10 Peters, 80; Elliott *v.* Swartwout, 10 Peters, 137; United States *v.* Lyman, 1 Mason, 504. United States *v.* 14 Packages, Gilpin, 235; United States *v.* Tappan, 11 Wheaton, 419; United States *v.* Freeman, 3 Howard, 564; Kunckle *v.* Kunckle, 1 Dallas, 364; United States *v.* Slade, 2 Mason, 75; Day *v.* Wilber, 2 Caines, 134; United States *v.* Two Bales of Cloths, 3 Hunt's Merchants' Magazine, 527; Liverpool Hero, 2 Gall. 183; Gilpin's D. C. R. 239, 240, and 241; United States *v.* 16 Packages, 2 Mason, 48; Moore *v.* Ewing et al., Coxe (N. J.) 144; The King *v.* Wykes, Andrews, 238; Billings *v.* Prinn et al., 2 Black. 1017; The King *v.* The Inhabitants of Hamstall Ridware, 3 Term R. 380; Dalling *v.* Matchett, Barnes, 57; Jacob's Law Dict., tit. *Oath,* p. 425; 1 Mayo's Fiscal Department, 364.

II. The mere letter of the Secretary of the Treasury, offered by the defendant below to justify the removal of the merchant appraiser Harvey, and the substitution of another, because said Harvey had asked for, or suggested to the collector, the delay necessary to procure the evidence deemed proper for a fair and faithful performance of his duty, could not legally justify such arbitrary removal and substitution, and was therefore properly rejected by the court below. Duty Act of 2d March, 1823, § 18; Duty Act of 30th August, 1842, §§ 16, 17; Tracy and Balestier *v.* Swartwout, 10 Peters, 80; Elliott *v.* Swartwout, 10 Peters, 137; United States *v.* Lyman, 1 Mason, 504; Alfonso *v.* United States, 2 Story, 421; Tucker *v.* Kane, MS. decision of Chief Justice Taney, Maryland Circuit.

III. The eighth section of the Duty Act of July 30th, 1846, under which the additional duty and penalty were exacted, was only applicable to goods, wares, and merchandise which had been "actually purchased," and not to those which had been "procured otherwise than by purchase"; and therefore did not authorize such exaction. Duty Act of 30th July, 1846, § 8; Whitney *v.* Emmett, 1 Baldwin, C. C. 316; Barlow *v.* United States, 7 Peters, 404.

20 *

Mr. Justice WOODBURY delivered the opinion of the court.

This writ of error is brought by the collector of Boston to reverse a judgment rendered against him in favor of Thompson et al., importers of a quantity of railroad iron.

The judgment was, that he should refund $ 6,681.28, which had been exacted of the importers, on the ground that the iron was appraised more than ten per cent. above the invoice. The first questions appearing on the record relate to rulings against the defendants, admitting certain evidence that the appraisers were duly sworn, to which the defendants objected.

But as the defendants do not bring a writ of error on that account, the final judgment being in their favor, we proceed to consider the rulings and instructions of which the collector, who is the plaintiff here, complains.

The first ground of objection by him is the refusal of the court below to allow in evidence a letter from the Secretary of the Treasury, to show that the removal of one of the merchant appraisers was made by his order.

We think, however, that the removal of that appraiser must be deemed valid or not, as to third persons, according as the collector possessed legal power to make it on the facts of the case. The orders as well as the opinions of the head of the Treasury Department, expressed in either letters or circulars, are entitled to much respect, and will always be duly weighed by this court; but it is the laws which are to govern, rather than their opinions of them, and importers, in cases of doubt, are entitled to have their right settled by the judicial exposition of those laws, rather than by the views of the Department. (Marriott *v.* Brune, 9 Howard, 634, 635.) And though, as between the custom-house officers and the Department, the latter must by law control the course of proceeding (5 Stat. at Large, 566), yet, as between them and the importer, it is well settled, that the legality of all their doings may be revised in the judicial tribunals. (Tracy et al., *v.* Swartwout, 10 Peters, 95; United States *v.* Lyman, 1 Mason, C. C. 504; Opinions of Attorneys-General, 1015.)

Besides this objection, there are specific exceptions, taken to these instructions below, which deserve a separate and more detailed examination. Those instructions, as set out in the record, re, —

"1st. That the date of the procurement of the iron in England or Wales, to wit, the 24th of January, was the time at which the appraisers should have fixed the value of the iron, and not the date of invoice and bill of lading, to wit, the 24th of February, when materially different.

"2d. That if both appraisers, in each set of appraisers,

did not make some personal examination of the iron, their report or decision was not made in conformity to law, and did not justify the penalty.

"3d. That the valuation of the merchant appraisers was invalid, because one of the merchants who made the appraisal was wrongfully substituted for another, to wit, the merchant appraiser who was turned out of office, or attempted to be, without any legal authority to do it on the facts of the case."

The first of these instructions extends merely to the point of law, whether the date of the procurement of the iron abroad was, by the acts of Congress, the proper time at which to fix the value of it, or the date of the invoice and bill of lading.

This has become a highly important question to the government, as well as the commercial world, under facts such as exist in this case, because a month had intervened here between the procurement and the shipment, and in the mean time, under one of those extraordinary fluctuations in prices which occasionally happen in trade, iron had risen nearly one fifth in value.

Ordinarily, the time of the procurement of an article, as also the time of the purchase of it, when it is bought and not manufactured by the importer, is near the date of the invoice or exportation, and the price differing but little. Then, if selecting for the period of the appraisal the latter date, it is acquiesced in by the importer as immaterial. But where, as in this instance, the difference in time and value is great, the importer has a right to insist on the time as provided by the acts of Congress.

Which is the proper time is, therefore, all that is involved in this first instruction, and not another question beside, which has been urged by the plaintiff in error ; whether the chartering of the vessel in England to transport the iron here, after it was ordered, made, and collected for shipment by the importers who manufactured it, should in point of law be deemed the time of its procurement. No charge below on that point is set out, none, therefore, can be revised here, however easily it could be settled.

After full consideration, we think that the time of procurement was the proper time for appraising the value, and it seems to us to have been stated in the instruction in conformity with both the express language of several acts of Congress, and the reason of the case.

The first leading act on this subject was passed March 1st, 1823. (3 Stat. at Large, 732.) Officers to appraise the value existed before only in the case of goods with no invoice, or damaged, or fraud suspected. (1 Stat. at Large, 41, 42, 166.) The invoice, with the oath of the importer, was previously the chief guide.

But under an impression that goods were often undervalued in the invoice after the increased duties imposed in 1816, and that the revenue thus became diminished, it was provided by the sixteenth section of the act of 1823, that appraisers should be appointed to examine and estimate the true value of the merchandise imported. And to remove all doubt as to the time when the value was to be fixed, it was expressly enacted in the fifth section, " that the *ad'valorem* rates of duty upon goods, wares, and merchandise shall be estimated in the manner following : to the actual cost, if the same shall have been actually purchased, or the actual value, if the same shall have been procured otherwise than by purchase, at the time and place when and where purchased, or otherwise procured, or to the appraised value, if appraised, except in cases where goods are subjected to the penalty provided for in the thirteenth section of this act, shall be added all charges, except insurance, and also twenty per centum on the said cost or value, and charges, if imported from the Cape of Good Hope, or any place beyond that, or from beyond Cape Horn, or ten per centum if from any other place or country ; and the said rates of duty shall be estimated on such aggregate amount : Provided, that in all cases where any goods, wares, and merchandise, subject to *ad valorem* duty, shall have been imported from a country other than that in which the same were manufactured or produced, the appraisers shall value the same at the current value at the time of exportation in the country where the same may have been originally manufactured or produced." (3 Stat. at Large, 732.)

These words seem too plain for doubt, that the time to fix the value, in a case like this, when the goods have been procured rather than purchased, is the time of procurement, and when purchased, is the time of the purchase ; and in neither case should be the date of the invoice or bill of lading, if they are at a different time.

It has been urged, however, in pursuance of a treasury circular of November 26, 1846, that this act should receive a different construction, and that the true time is the time of exportation ; because that is named in the proviso, and thus is supposed to annul or modify all which precedes it.

But it seems to be overlooked, that the proviso relates to another kind of merchandise than that regulated before in the body of the section, the former being expressly goods of an origin foreign to the country whence they are now to be imported, and the latter, goods not foreign, but of the growth or manufacture of the country from which they are imported hither.

As the time of the original procurement or purchase of the proviso goods in the country of their birth might have been years before, and difficult to fix, a new and different time is selected for them, namely, the period of their exportation to this country.

This distinction has been ever since preserved in our laws between these kinds of merchandise. See the sixteenth section of the Act of August 30, 1842 (4 Stat. at Large, 564) ; see also Alfonso v. United States, 2 Story, 429, 430.

It would be very irrational to consider such a proviso as a repeal or a change of the body of a section where it does not contradict it, but merely purports to regulate the appraisal of a different species of goods in a different manner. (See on this, 1 Kent, Com. 462, 463.)

The proviso does not pretend, in words or spirit, to interfere with goods situated like those contained in the shipment in the present case, and hence, instead of conflicting, it is in harmony and consistent. 23 Maine, 360.

As further proof that the time of the procurement was to remain the guide in cases like this, notwithstanding the proviso, the fourth section of this act continues in full force and unmodified, and requires the manufacturer or owner, as was done here, when importing, to swear that " the goods were not actually bought by me in the ordinary mode of bargain and sale, but are of the value stated, including charges, &c., at the time or times, and place or places, when and where procured for my account." (3 Stat. at Large, 732.) See on this oath, 2 Story, 430.

So the eighth section still exists, and positively requires the oath of the importer, when, as here, a foreigner, that " the invoice contains a true and faithful account of the said goods, wares, and merchandise, at their fair market value at the time and place when and where the same were procured or manufactured, as the case may be, and all charges thereon." 3 Stat. at Large, 733.

Other similar illustrations of this might be cited, but are not necessary to support this obvious position, that the time of procurement is the true time for fixing the value, when the goods are manufactured or procured otherwise than by purchase, and are not of an origin foreign to the country whence they are imported hither. Indeed, it would seem reasonable, independent of the express language of the acts of Congress, that, if uncertainty remained about the true construction of the fifth section of the act of 1823, the proper time for fixing the value of goods should be considered the time they were purchased or procured ; because the idea of having the value and charges fixed, and

assessing the duty on them, is to tax the importer on the amount or value he has expended. And what he has expended cannot be more than what he has thus paid; and the invoice itself, often prepared, as in the interior, days and weeks before the vessel sails, states the price or value as thus made up, and not at the time of the bill of lading, when the market value may be higher or lower.

We do not find that the value at the time of exportation of goods of the growth or manufacture of the country whence exported, has ever been selected by any act of Congress for the purpose of assessing the duty. Though in one instance it is adopted merely to compile statistical tables of the value of foreign imports (3 Stat. at Large, 542), it is never done to regulate duties.

The value for statistical purposes it is reasonable to fix at the time of exportation, because it thus indicates the worth of all shipped hither, which is what is then desired; but the value on which to tax the importer is the capital or price he has invested in the goods, which is *primâ facie* the amount paid, if purchased, or the amount for which they were procured, if not purchased.

There is another objection in this case to the applicability of the act of 1842, if construed to affix this penalty to an undervaluation of goods, procured otherwise than by purchase. (See §§ 16, 17; 5 Stat. at Large, 563, 564.)

That act applies expressly only to goods "purchased." So the act of 1846, July 30, applies only to goods "actually purchased." See § 8, page 43, Pamphlet Laws for 1846.

They thus appear to leave goods, procured other ways than by purchase, to the provisions of the acts of 1823 and 1830, which do not at all affix the penalty here exacted, looking to the value, whether when procured o when exported.

Especially in a penal provision, it could not seem judicious, any more than legal, to extend it beyond the clear language of the act. (See cases in Maxwell v. Griswold, *post*, p. 242.) But on this objection, growing out of the words of the act of 1842, it is hardly necessary to give a decisive opinion, as the instruction to the jury does not in form cover it; and on the other ground, the appraisal is palpably erroneous, on account of its being made as of the wrong time.

The second general instruction excepted to is, that the appraisal was invalid, because not made on a personal examination of any of the goods by all of those certifying to its correctness.

It is almost impossible to adopt any other construction of the acts of Congress, or of the analogies of the case. Those

Greely v. Thompson et al.

acts expressly require, that the appraisers should inspect or examine a portion of the goods pointed out by the collector. 4 Stat. at Large, 410 ; 3 Stat. at Large, 736 ; 5 Stat. at Large, 565.

The oaths administered to them are, " diligently and faithfully to examine the goods," &c. Act of 1823, § 16 (3 Stat. at Large, 735).

So of the assistant appraisers, the oath is in like words. (4 Stat. at Large, 409).

In this very case the appraisers swore " diligently and faithfully to examine and inspect said lot of railroad iron," and reported that " we have examined" it, &c., when the record states, that one of the merchant appraisers " never saw the iron," and one of the permanent appraisers did not " examine," and " did not inspect or see the iron."

Besides this, it would be unreasonable to overturn the invoices and oaths of importers, unless by a personal inspection and examination ; an insufficient value should clearly appear to have been affixed, considering the quality of the article first, and next the market value abroad of articles of that quality, at the time required by law.

But it has been urged, that if one examines and reports to the other that the article is " merchantable," the other can correctly fix the value, by knowing the value of what is merchantable.

The answer to this is, that the law requires the quality to be fixed by inspection or examination, and not alone by evidence or opinion of others.

Again, too, an article may be barely merchantable, and yet not be worth so much as one that is not only merchantable, but on the brink of being better than merchantable. A personal examination, therefore, is proper for making such discriminations in quality and value.

It is further urged against our construction, that a sufficient force does not exist in most custom-houses for all the appraisers to make personal examinations, or all the assistant appraisers to do it. There are two answers to this. If officers enough to perform these public duties do not exist, more should be authorized, or their duties to examine in person should be dispensed with by an act of Congress. Again, the collector need detail no more officers to make the appraisal than can be spared, or than the law imperatively demands. All we hold is, that such as are detailed in a particular case should do their duty, in the manner which their oaths require ; and it would be a novelty for courts to countenance one or more persons, if undertaking a duty in such a case, to be exonerated from it because it was burdensome or difficult.

There is, too, a sufficient answer to another objection, that, if a personal examination was required of every article, time enough would not exist for the purpose. For the acts of Congress do not require every article in a package to be examined. A fair selection of specimens or samples is made sufficient. (3 Stat. at Large, 735, § 15.)

The instruction by the court below on this point is, therefore, the only one tolerated by the language of the acts of Congress and the oaths of the appraisers, though a different usage may have grown up at some ports, without intending any thing negligent or wrong.

The only remaining question is, whether the removal of one of the merchant appraisers, and the substitution of another, who estimated the value, was not on the facts of this case irregular, so as to make their appraisal invalid.

The court below instructed the jury it was so. We feel constrained, by the law and reason of the case, to concur in that view. The person removed was one selected as a member of an appellate tribunal, to revise the value estimated by the regular appraisers, and he was removed and another appointed, as the record shows, not for any misconduct discovered, or any incompetency intervening, by act of God or otherwise, but merely because he wished time given to obtain more evidence from England, which might justify a lower estimate.

Now, without saying what might be proper in case of a strictly public officer, *quasi* judicial and misbehaving, as nothing was ruled on that point below, and indeed without holding what might be competent in case of an arbitrator or referee, public or private, becoming corrupted or incapable, as the ruling did not apply to that case, we are satisfied that the allowance of an appeal to merchant appraisers by the importer would be nugatory, or a mockery, if a member of the tribunal can be removed by the collector or Secretary whenever his opinion appears not likely to accord with theirs on the matter submitted. He is, as to that, a *quasi* judge, a " legislative referee." Rankin v. Hoyt, 4 Howard, 327.

And an interference with such a referee for such a cause would conflict with all just notions of judicial independence, or judicial purity, and when done and sanctioned as to a public referee, it might shake confidence abroad as well as at home in the administration of our revenue system, as connected with commercial imports. In all free countries, public sentiment is much shocked by any interference with judicial duties, tending to warp them. And more especially, if so made as to be likely to influence a pending question in favor of those interfering, and actually ending in the removal of a judicial incumbent

merely for an opinion expressed in the course of the case which was not agreeable.

Again, the merchant appraisers here can hardly be considered public officers at all, in the ordinary acceptation of the term. One of them was formerly selected by the importer alone. Neither of them now holds a commission, nor are they selected to discharge generally public duties of a certain character.

But they are mere umpires between the permanent appraisers and the importers, when disagreeing as to the value in some particular case; and it is difficult to see how, when third persons are interested in their decision, the other side, whether represented by the collector or Secretary, could, without the consent of those third persons, or without some grave public ground beyond a mere difference of opinion, remove an umpire, and thus attempt to change the award about to be made.

Though some very culpable cases of removals of public judicial officers occurred in England before her revolution, during the arbitrary reign of the house of Stuart, and led for security to a change in the tenure of their offices from the pleasure of the king to good behaviour, yet nothing of the kind seems since to be countenanced, here or there, for mere difference of opinion. And the course pursued in the present instance was probably the result of not adverting to the judicial character of a merchant appraiser, or of a misapprehension as to the duty and right to do the act, only for requesting delay to obtain more evidence, rather than arising from any intentional abuse of power.

The delay, asked for the benefit of the importers, was also to prevent a penalty; and in such a case, when doubts exist, the respondent is to be favored. (7 Peters, 453; 1 Baldwin, C. C. 317.) The removal, made to avoid this delay of further evidence against the forfeiture, was likewise in the case of merchants and manufacturers of apparently high respectability, and without a particle of evidence indicating any intent by them to defraud the government.

Almost the whole system of appraisals is founded on the idea, that fraud has been, or is likely to be, practised. And while this court has never been backward in ferreting out and punishing real frauds attempted on the revenue, yet, at the same time, where no dishonesty is pretended, but a disposition appears in the importer to conform to the laws, he is entitled to full legal protection, else fair commerce between us and the rest of the world will be discouraged, and our national character tarnished.

The government, too, could not suffer by the delay asked here, as they, in the mean time, would hold the goods, unless

the increased duties on the highest appraisal, and the penalty, were paid to them.

The judgment below is affirmed.

### Order.

This cause came on to be heard on the transcript of the record from the Circuit Court of the United States for the District of Massachusetts, and was argued by counsel. On consideration whereof, it is now here ordered and adjudged by this court, that the judgment of the said Circuit Court in this cause be, and the same is hereby, affirmed, with costs and damages at the rate of six per centum per annum.