**WASHINGTON INTERNATIONAL INSURANCE CO., Plaintiff,**

v.

**The UNITED STATES of America, Defendant.**

**Court No. 81–12–01678.**

United States Court of International Trade.

Jan. 12, 1988.

Wayne Jarvis, Ltd., Wayne Jarvis, and Tribler & Marwedel, Paul McCambridge, Chicago, Ill., for plaintiff.

Richard K. Willard, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Civil Div., J. Kevin Horgan, Washington, D.C. and Joseph I. Liebman, Attorney in Charge, Intern. Trade Field Office, Commercial Litigation Branch, U.S. Dept. of Justice, Nancy E. Reich, New York City, for defendant.

Andrew P. Vance, Michael A. Johnson, Mark Neville, Jr., Norman Schwartz and Sidney N. Weiss, New York City, for Customs and Intern. Trade Bar Ass'n, amicus curiae.

Before RE, C.J., and WATSON and AQUILINO, JJ.

## OPINION

AQUILINO, Judge:

Defendant's motion to strike plaintiff's demand for trial of this action by jury has raised issues of uncommon importance, the decision of which, as the Chief Judge pointed out in his memorandum opinion of April 2, 1987, will have "broad or significant implications in the administration or interpretation of customs laws", 11 CIT ——, 659 F.Supp. 235, 238.

### Background

The pleadings and pretrial papers indicate purchase in Cypress of some 64 metric tons of cheese for $160,000. This merchandise was delivered to Greece, where it was loaded on a ship for the United States in refrigerated containers. The cargo was landed at Baltimore and transferred to Chicago under an immediate delivery permit. Upon arrival there, the importer suspected that the cheese was in a "deteriorated condition unsuitable for sale to consumers", to quote from the complaint, and so notified the marine underwriters of the shipment, who disposed of the merchandise on an "as is, where is" basis for $7,406.08.

The importer had entered the merchandise as pecorino, duty-free under item A117.67, TSUS. However, the Customs Service tested the cheese and concluded that it derived from cow's, rather than sheep's, milk. As such, it was classifiable under TSUS item 117.85 at a rate of duty of 10 percent *ad valorem*. Customs appraised and liquidated the merchandise on the basis of an export value of $160,000.

As the importer's surety, Washington International Insurance Co. paid the liquidated duties and protested the Service's appraisal.[1] The District Director denied the protest, whereupon this action was commenced.

Plaintiff's complaint alleges, in the alternative, that the cheese should have been appraised at the salvage bid of $7,406.08 or that it should have been entered as dam-

---

1. Defendant's proposed pretrial order indicates that the plaintiff has abandoned the question of
the kind of milk from which the cheese derived.

aged merchandise in the same value. The complaint also demands a jury trial.

The defendant interposed a motion to strike the jury demand. The plaintiff countered with a motion to have the issue resolved by a court of three judges pursuant to 28 U.S.C. § 255 and CIT Rule 77(d)(2) (1986). Plaintiff's motion was granted by the Chief Judge in his memorandum opinion, 11 CIT ——, 659 F.Supp. 235 (1987).

Both sides, as well as attorneys for the Customs and International Trade Bar Association, as *amicus curiae*, have thoroughly briefed the questions raised by defendant's motion to strike, and oral argument has been heard.

I

In support of its motion, the government argues that neither an act of Congress nor the Constitution supports trial of this action to a jury. As to the first point, the plaintiff relies on the Customs Courts Act of 1980 provision for jury trials in the Court of International Trade, 28 U.S.C. § 1876. That statute, however, does not specify either which kinds of actions are entitled to such a trial or which kinds are not, rather what procedures are to be followed for any jury.

At a minimum, the parties and the *amicus curiae* are in agreement that actions brought by the United States to recover penalties pursuant to section 592 of the Tariff Act are triable to a jury.[2] There is support for this viewpoint in practice prior to 1980 [3] as well as in the legislative history of the 1980 act [4] and in subsequent practice of this Court. *See, e.g., United States v. Priority Products, Inc.,* 9 CIT 392, 615 F.Supp. 593 (1985). However, even if this were not true, the Supreme Court has held in *Tull v. United States,* —— U.S. ——, 107 S.Ct. 1831, 95 L.Ed.2d 365 (1987), that actions brought by the government to determine liability for civil penalties are triable to a jury. Unlike the Customs Courts Act, the statute underlying that case, the Clean Water Act of 1977, 33 U.S.C. § 1251 *et seq.,* was silent on the right to a jury.

The plaintiff here urges us to accept the premise that the 1980 statute provides a "comprehensive right of trial by jury". Plaintiff's Brief, p. 10. Its written and oral presentations emphasize the legislative history of enactment of section 1876, *e.g.,* the testimony in 1980 of defendant's lead counsel herein, to wit:

> MR. COHEN. I think you have to make a judgment first as to whether or not this court is going to be empowered to hold jury trials. If it is not, then I think all jury trial cases should be transferred to the district court. If it is to be empowered to conduct jury trials, it should conduct jury trials on all types of cases.[5]

The definitive congressional report itself refers to the fact that the act "creates a comprehensive system of judicial review of civil actions arising from import transactions" to "ensure greater efficiency in judicial resources and uniformity in the judicial decisionmaking process." H.R.Rep. No. 1235, 96th Cong., 2d Sess. 20 (1980), U.S. Code Cong. & Admin.News 1980, p. 3731.

Whatever the import of such statements in regard to the enactment of section 1876, it is clear that Congress has consented to suit in an action like this in 28 U.S.C. § 1581(a) and § 2631(a) and that trial by jury is deeply embedded in the jurisprudence of the United States. *See* Point II, *infra.* Indeed, as indicated above, the Su-

---

**2.** *See, e.g.,* Memorandum in Support of Defendant's Motion to Strike Plaintiff's Demand for a Jury Trial [hereinafter cited as "Defendant's Memorandum"], p. 8; Brief of Amicus Curiae, p. 36. *See also* Plaintiff's Opposition to Motion to Strike Demand for Jury Trial [hereinafter cited as "Plaintiff's Brief"], p. 20.

**3.** *See, e.g., United States v. Santini,* 266 F. 303 (2d Cir.1920) (Tariff Act of 1913); *Jen Dao Chen v. United States,* 385 F.2d 939 (9th Cir.1967) (Tariff Act of 1930).

**4.** *See, e.g.,* H.R.Rep. No. 1235, 96th Cong., 2d Sess. 34 (1980); S.Rep. No. 466, 96th Cong., 1st Sess. 12 (1979), U.S.Code Cong. & Admin.News 1980, pp. 3729, 3747.

**5.** *Customs Courts Act of 1980: Hearing on H.R. 6394 Before the Subcomm. on Monopolies and Commercial Law of the House Comm. on the Judiciary,* 96th Cong., 2d Sess. 76 (1980).

preme Court has determined that the right to such a trial exists for recent, statutory actions brought by the government. On the other hand, in an action against the government based on a 1974 amendment of the Age Discrimination in Employment Act, the Supreme Court noted the absence of an express grant of trial by jury and pointed out that a statutory right thereto exists "only where Congress has affirmatively and unambiguously granted that right". *Lehman v. Nakshian*, 453 U.S. 156, 168, 101 S.Ct. 2698, 2705, 69 L.Ed.2d 548 (1981). If this is the standard for analysis of a statute, the Customs Courts Act of 1980 does not meet it.

## II

The plaintiff also relies, of course, on Amendment VII to the Constitution which provides that in "Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved".[6] The Supreme Court has concluded that, "by referring to the 'common law,' the Framers of the Seventh Amendment were concerned with preserving the *right* of trial by jury in civil cases where it existed at common law". *Colgrove v. Battin*, 413 U.S. 149, 155, 93 S.Ct. 2448, 2452, 37 L.Ed.2d 522 (1973) (emphasis in original). *See also Atlas Roofing Co. v. Occupational Safety & Health Review Comm'n*, 430 U.S. 442, 459, 97 S.Ct. 1261, 1271, 51 L.Ed.2d 464 (1977).

The reports of both English and American lawsuits are replete with customs cases, many decided by juries, before and after adoption of the Seventh Amendment in 1791. Indeed, the government and the *amicus curiae* both admit the existence of jury trials of cases involving customs at common law. *See, e.g.,* remarks of defendant's counsel on July 31, 1987, Tr. pp. 6–7; Defendant's Supplemental Memorandum, pp. 12, 14; and Brief of Amicus Curiae, p. 5 and p. 10 as follows:

> The early history of customs cases reveals that such cases were tried at common law before a jury. The defendant was an individual—in the United States, usually the Collector of Customs.

 \* \* \* \* \* \*

> Under the British Crown and in America prior to 1791, an individual's right at common law to sue a customs officer for recovery for the wrongful seizure of goods was well established. Jury trials appear to have been fairly common.

Nevertheless, each argues against trial of this action to a jury, the defendant essentially based on its perception of the prerogatives of Congress, whereas the *amicus curiae* concludes from its review of history that there were essentially no jury trials in appraisement, as opposed to classification, cases up until the Customs Administrative Act of 1890, 26 Stat. 131, which then removed them from trial courts altogether.

Neither viewpoint warrants grant of the motion to strike plaintiff's jury demand.

### A

■ The test as to whether a party such as the plaintiff is entitled to trial by jury is whether such a right existed in England prior to the time the Seventh Amendment was adopted. *See United States v. Wonson*, 28 F.Cas. 745, 750 (C.C.D.Mass.1812) (No. 16,750); *Parsons v. Bedford*, 28 U.S. (3 Pet.) 433, 446–47, 7 L.Ed. 732 (1830); *Capital Traction Co. v. Hof*, 174 U.S. 1, 22–23, 19 S.Ct. 580, 588–89, 43 L.Ed. 873 (1899); *Slocum v. New York Life Insurance Co.*, 228 U.S. 364, 377, 33 S.Ct. 523, 528, 57 L.Ed. 879 (1913); *Baltimore & Carolina Line, Inc. v. Redman*, 295 U.S. 654, 657, 55 S.Ct. 890, 891, 79 L.Ed. 1636 (1935); *Damsky v. Zavatt*, 289 F.2d 46 (2d Cir. 1961); *Goar v. Campania Peruana de Vapores*, 688 F.2d 417, 424 (5th Cir.1982).

By that time, it was well-established that the right to sue to recover excess duties existed in England. For example, in *Campbell v. Hall*, 98 Eng.Rep. 848 (1774), an exporter brought an action in trespass

---

**6.** In addition, the plaintiff cites CIT Rule 38(a), which provides that the "right of trial by jury as declared by the Seventh Amendment to the Constitution or as given by a statute of the United States shall be preserved to the parties inviolate." *See also* Federal Rule of Civil Procedure 38(a), 28 U.S.C. (1987).

on the case against a customhouse officer who had imposed certain duties on sugar exported from Grenada, a British colony. Based upon the findings set forth in a special verdict returned by the jury for the plaintiff, the court determined that the "impost of four and one half percent" had been unlawfully exacted, as conflicting proclamations issued by the king had negated any such authority. It was held in *Stevenson v. Mortimer*, 98 Eng.Rep. 1372 (1778), that shipowners could bring an action in assumpsit for money had and received against a customhouse officer to recover excess duties which had been collected from the ship's master. In *Greenway v. Hurd*, 100 Eng.Rep. 1171 (1792), the trial judge had nonsuited the plaintiff's action in assumpsit against a collector of duties no longer in effect at the time of payment. While affirming the nonsuit on the ground of inadequate notice to the defendant collector, who had already submitted the payment to his superior, the King's Bench indicated that the plaintiff was not without a remedy at law—against the person in possession of the unlawful collection.

In short, customs actions in England were at law and thus triable to a jury.

### B

The implication of the fine *amicus* brief is that customs cases involving appraisement issues were not, as a rule, triable in court or to juries during the time of the adoption of the Seventh Amendment and thereafter in the United States. There are, however, reports of sufficient such cases to indicate that this was not necessarily the rule.

#### 1. Damage Issues

One of the appraisement issues that could be contested in court was whether goods were damaged prior to their importation, an issue which is presented by this action. For example, *Wight v. Curtis*, 29

F.Cas. 1170 (C.C.S.D.N.Y.1845) (No. 17,-628), which was tried before a jury, involved questions as to the extent of the damage done and whether the importer was required to produce a certificate of the port wardens before an appraisement and a deduction for that damage could be claimed. The case involved cargo on a ship which "grounded in a heavy wind, and filled and sunk" upon arrival at New York. The vessel was subsequently raised and towed into the city, and its cargo was offloaded and, by consent of the parties, "ordered by the collector to be deposited in a public store-house". *Id.* The merchandise had been damaged by seawater to the extent of 60 percent of value. The plaintiffs produced certificates of the port wardens on all of their packages, except one, and the collector allowed an appraisement of the damage to those packages. At issue in the case was the question of the appraisement of the remaining package. The plaintiffs had offered the collector a sworn survey and appraisement conducted by an individual [7] who certified that he found the goods "to have been damaged on the voyage of importation". *Id.* They also produced a deposition of the ship's master proving the injury to the cargo.

The court determined that this evidence as to damages was admissible. While noting that the collector in his argument had made some criticism as to the nature of the proof of damage and its sufficiency, the court determined that "the objection in the trial referred essentially to their admissibility" and, since the "fact and extent of damage was not made a prominent point", the court regarded "the testimony ... sufficient to have justified the jury in finding for the plaintiffs". *Id.* at 1171. After examining the pertinent statutes, the court determined that certification by the port wardens was not required. Therefore, the plaintiffs were entitled to judgment on their verdict. *See id.* at 1174.

---

**7.** The opinion is unclear as to the precise title of this person. The court indicated that he "represent[ed] himself to be a person 'selected by the parties interested, to survey, appraise, arbitrate, and judge of vessels and goods arriving damaged, or becoming damaged in the port of New York'". 29 F.Cas. at 1170. There is also some indication that he may have been a marine surveyor appointed by the chamber of commerce and board of underwriters of the port of New York. *See id.* at 1171.

The issues in the action at bar are similar to those resolved in *Wight*. As indicated above, the defendant disputes plaintiff's claim that the cheese was damaged prior to its importation. In addition, the defendant contends that, since the plaintiff failed to inform it of the impairment of the perishable product within 96 hours of unloading, the judicial relief requested cannot lie. These issues are close to the questions in *Wight* concerning the proof of damages and the failure to notify appropriate officials. Thus, a position that issues of the kind raised herein were not tried in a court of law before a jury [8] is not well-grounded.

## 2. Waste Issues

Questions involving leakage and waste could also be resolved by a jury. *Lawrence v. Caswell*, 54 U.S. (13 How.) 488, 14 L.Ed. 235 (1851), was a suit against a collector of customs to recover duties paid under protest on imported brandy that had leaked during shipment. Tried before a jury in the Circuit Court for the Southern District of New York, the plaintiff contended that duties had been assessed based on the quantity stated in the invoices and not the actual amount imported, as ascertained by gaugers, thus failing to account for the leakage. Additionally, the plaintiff claimed entitlement to a statutory deduction for leakage, as that allowance is made for waste occurring after the liquor has arrived but prior to its sale.

The trial judge, agreeing with this interpretation of the law, charged the jury accordingly, and it found for the plaintiff. The Supreme Court, while reversing on the statutory deduction issue on the ground that it had no application to an *ad valorem* duty, explained that judicial review was available because "the duty demanded was paid under protest, stating specially the ground of objection." 54 U.S. at 496.

*Marriott v. Brune*, 50 U.S. (9 How.) 619, 13 L.Ed. 282 (1850), similarly was an action in assumpsit brought against the collector of the port of Baltimore to recover excess

duties paid under protest upon importations of sugar and molasses. The collector had assessed duties based on the quantities specified in invoices. The quantities which arrived and were entered, however, were less than those shipped, due to damage and waste. The importers' contention that duty should be paid only on amounts entered was upheld by the Circuit Court for the District of Maryland, although the holding applies only to duties that had not been finally assessed by the collector because the importers' protest was found to be insufficient.

The Supreme Court affirmed that decision, concluding "that revenue should be collected only from the quantity or weight which arrives here. That is, what is *imported*". 50 U.S. at 632 (emphasis in original). The Court compared the loss of the sugar to loss of merchandise by perils of the sea, fire or natural decay. *See id.* at 634.

As to the finality of the appraisers' estimate, the Court stated "it could be final only as to the price of the sugar abroad, and not as to the quantity or weight reaching this country. The latter is fixed by another class of officers, authorized by law for that purpose; and if the appraisers undertake to fix it, their action in that respect is *coram non judice*, and a nullity." *Id.* at 634.

While *Marriott* was apparently tried on an agreed statement of facts before a judge, it was brought in assumpsit (as were classification cases), and therefore could have been tried to a jury. In fact, *Marriott*'s companion case before the Supreme Court, involving the same question as to whether an allowance should be made for leakage and drainage, was tried before a jury. *See United States v. Southmayd*, 50 U.S. (9 How.) 637, 638, 13 L.Ed. 290 (1850). That action, however, was postured differently, as the government had brought it to recover unpaid duties. The Court affirmed the decision below in favor of the importer.

---

8. *See, e.g.*, Defendant's Supplemental Memorandum, pp. 12 and 16–17; Brief of Amicus Curiae, pp. 10–11 and 37.

Other cases involving waste issues included *Austin v. Peaslee*, 2 F.Cas. 235 (C.C.D.Mass.1857) (No. 666), where hemp imported from Manila had "lost weight during the voyage", and *Schuchardt v. Lawrence*, 21 F.Cas. 747 (C.C.S.D.N.Y.1856) (No. 12,484), where gin "had leaked out of the casks during the voyage." Based on the courts' application of *Marriott* and *Lawrence v. Caswell*, the plaintiff importers prevailed on claims that their goods had been appraised on the basis of invoice quantity as opposed to the amount actually landed, thus allowing them to recover the excess of duties exacted by the defendant collectors.

Leakage disputes bear similarity to damage claims, as both involve a reduction in the value of the merchandise prior to arrival. *See Marriott*, 50 U.S. at 634. While the former entail a loss in quantity, the latter involve a reduction in quality.

### 3. Timing-of-Valuation Issues

An importer could bring an action to contest the date used by an appraiser to determine foreign-market value. *E.g., Maxwell v. Griswold*, 51 U.S. (10 How.) 242, 13 L.Ed. 405 (1850), and *Greely v. Thompson*, 51 U.S. (10 How.) 225, 13 L.Ed. 397 (1850). In each case, this question was subjected to the review of both a judge and jury. *Maxwell* involved an importation of sugar and hemp from Manila. The goods had been purchased in March and April 1849 but were not shipped until July 24th of that year. Their value had appreciated during this period, and the importers protested the decision to appraise the goods on the basis of their market value as of the day of shipment. The jury returned a verdict for the importers, and the Supreme Court affirmed the judgment.

Likewise, the companion case, *Greely*, involved an assumpsit action tried before a jury seeking to recover excess duties that had been exacted by a collector. The importers had purchased railway iron and made it ready for shipment on January 24, 1849. However, loading was completed a month later, during which period the value of the iron had increased. The collector determined the duties based on the increased value of the goods, but the Court affirmed a judgment that January 24th was the appropriate point of reference for appraisement purposes.[9]

*Maillard v. Lawrence*, 16 F.Cas. 501 (C.C.S.D.N.Y.1855) (No. 8,972), in which a jury found for the plaintiff, subject to the court's opinion, also involved a situation where value had increased greatly between time of purchase and time of importation. The evidence presented to the jury at trial established that the goods had been appraised in accordance with instructions of the Secretary of the Treasury, at the time of exportation rather than of purchase. While the defendant agreed that the earlier value should have been used, it contended that the protest was insufficient. The court disagreed, thus entitling importers to recover excess duties paid. *See also Morlot v. Lawrence*, 17 F.Cas. 772 (C.C.S.D.N.Y.1853) (No. 9,816).

### 4. Foreign Currency Issues

During the 19th century, an importer could bring an action in court to contest appraisement based on the valuation of a foreign currency. For example, in *Heinemann v. Arthur's Executors*, 120 U.S. 82, 7 S.Ct. 446, 30 L.Ed. 605 (1887), the collector had valued Russian wool at an amount higher than that reflected on the importer's invoice, based upon the worth of rubles in U.S. currency. A jury was presented with the facts surrounding the purchase of the merchandise in Russia, its date of exportation and how its value should have been assessed based on the ruble, but the trial judge directed a verdict for the defendant

**9.** *Greely* also involved the removal and replacement of one of the merchant appraisers who wanted to obtain more evidence that might justify the lower estimate. The Court agreed with the trial judge's instruction to the jury that the appraisal was invalid because of this irregular conduct.

The defendant attempts at page 14 of its supplemental brief to make it seem as if such suits were only "permitted when there was fraud upon the part of the appraisers, or some irregularity in the selection of the appraiser", but *Greely*, as well as other cases discussed above, involved issues related to the action at bar.

based on his interpretation of the statute. The Supreme Court affirmed.

In *Alsop v. Maxwell*, 1 F.Cas. 573 (C.C.S. D.N.Y.1853) (No. 263), the importer proved to a jury that the currency in question had been debased or depreciated. The collector was therefore found to owe the excess duties that had been paid. The same result was reached in *Alsop v. Maxwell*, 1 F.Cas. 574 (C.C.S.D.N.Y.1856) (No. 264), another case involving a dispute as to the value of a foreign currency. While the court in *Roosevelt v. Maxwell*, 20 F.Cas. 1155 (C.C. S.D.N.Y.1856) (No. 12,034), primarily examined the classification of glass from Germany, it also determined that the valuation of the merchandise was in error based on the collector's incorrect determination of its worth in U.S. currency. Judgment was entered for the importers for the excess of duties they had been required to pay as a result of that error.

### 5. Commissions

Another issue raised in valuation cases was the amount for a commission added to an appraisement by a collector. In *Munsell v. Maxwell*, 17 F.Cas. 999 (C.C.S.D.N. Y.1855) (No. 9,932), a jury, presented with evidence as to the appropriate value of commissions on goods from China, found the duties exacted to be beyond the usual rate. Accordingly, judgment was entered on the verdict for the plaintiff, subject to the opinion of the court. Likewise, the plaintiff in *Riess v. Redfield*, 20 F.Cas. 774 (C.C.S.D.N.Y.1859) (No. 11,821), prevailed on his claim that the commissions added to the value of the goods were excessive. The importer in *Norcross v. Greely*, 18 F.Cas. 301 (C.C.D.Mass.1852) (No. 10,294), brought an action, tried before a jury, in which he alleged that he should not have been charged for a commission, since none had been paid. He thereafter elected to discontinue the case.

### 6. Freight Issues

Often, importers would claim that valuation improperly included freight charges. This occurred, for example, in *Wilbur v. Lawrence*, 29 F.Cas. 1188 (C.C.S.D.N.Y. 1851) (No. 17,635), where a jury returned a verdict for the plaintiff, subject to the court's decision. The court held that transportation costs incurred because of a blockade had been improperly included in appraising the value of the goods. Similarly, in *Gant v. Peaslee*, 9 F.Cas. 1143 (C.C.D. Mass.1855) (No. 5,212), the court directed a verdict for the plaintiff, finding that charges added to the appraised value of the goods for their passage to an intermediate port before reaching the United States were nevertheless "freight, and ... not to be included as a dutiable charge". *Id.* at 1145. The same conclusion was reached by the court in *Barnard v. Morton*, 2 F.Cas. 840 (C.C.D.Mass.1850) (No. 1,006), as it related to freight incurred to the intermediate port of Halifax. *See also Warren v. Peaslee*, 29 F.Cas. 280 (C.C.D.Mass.1855) (No. 17,198) (inland freight properly added to appraised value); *Millar v. Millar*, 17 F.Cas. 289 (C.C.D.Mass.1855) (No. 9,546) (where a judge directed a verdict for the importer to recover freight incurred on one leg of a voyage added on by the collector as dutiable charges but found that other charges were properly added to market value); *Bliss v. Redfield*, 3 F.Cas. 714 (C.C. S.D.N.Y.1860) (No. 1,549) (where the importer prevailed on his claim that the appraisers had improperly added freight to the valuation of the merchandise).

### 7. Packaging Issues

Another issue raised in suits against collectors was the appropriateness of adding the cost of packaging to the value of the merchandise. In *Badger v. A. Cusimano & Co.*, 130 U.S. 39, 9 S.Ct. 431, 32 L.Ed. 851 (1889), the Court not only affirmed the trial judge's decision that the collector had improperly added to the invoice value certain charges relating to its packaging, but also affirmatively stated that this question was subject to judicial review. While the jury in *Wilson v. Maxwell*, 30 F.Cas. 147 (C.C.S.D.N.Y.1851), (No. 17,824), returned a verdict for the importer, subject to the opinion of the court, the trial judge found that the appraisers had properly included the actual weight of boxes of soap, less a fixed rate for tare. The court did allow the

importer to recover the additional duties that had been paid as a penalty for undervaluation because of the misinterpretation of the statute. *See also Cobb v. Hamlin,* 5 F.Cas. 1129 (C.C.D.Mass.1868) (No. 2,922); *Saxonville Mills v. Russell,* 21 F.Cas. 595 (C.C.D.Mass.1870) (No. 12,413).

## 8. Fraud

Another area subject to trial by jury involved issues of fraud. For example, in *Lillie v. Redfield,* 15 F.Cas. 538 (C.C.S.D. N.Y.1857) (No. 8,351), the trial judge upheld a jury's finding that fraud had been perpetrated on the importers. That is, the goods shipped did not conform to the contract and invoice, and the importers were thus entitled to recover excess duties paid as a result of the collector's determination to rely on the misleading invoice.

### C

Little doubt exists from the foregoing cases that persons aggrieved by unlawful collections of duties possessed the right to recover them in an action at law. Indeed, one perceptive student of the history of such actions in the 19th century, Judge George S. Brown of the Customs Court, commented:

> The original common law remedy for the recovery of taxes illegally collected was so broad and all inclusive upon both questions of fact as well as questions of law that to give a narrower, less inclusive construction to the present statutory

remedies would seem to be inadmissible as in degradation of the common law.[10]

This comment was written in regard to the dissenting opinion of Justice Story in *Cary v. Curtis,* 44 U.S. (3 How.) 236, 11 L.Ed. 576 (1845), the outcome of which led to an immediate congressional declaration that nothing in earlier legislation requiring duties to be remitted to the Treasury as soon as collected[11]

> shall take away, or be construed to take away or impair, the right of any person or persons who have paid or shall hereafter pay money, as and for duties, under protest, to any collector of customs, or other person acting as such, in order to obtain goods, wares, or merchandise imported by him or them, or on his or their account, which duties are not authorized or payable in part or in whole by law, to maintain any action at law against such collector, or other person acting as such, to ascertain and try the legality and validity of such demand and payment of duties, and to have a right to a trial by jury, touching the same, according to the due course of law.[12]

In other words, Congress overruled *Cary.*

The defendant herein disagrees with this analysis, citing *Arnson v. Murphy,* 109 U.S. 238, 3 S.Ct. 184, 27 L.Ed. 920 (1883), and *Nichols v. United States,* 74 U.S. (7 Wall.) 122, 19 L.Ed. 125 (1869). Those cases, however, stand simply for congressional authority to require a written protest as a condition precedent for suit and to

---

**10.** Brown, *A Dissenting Opinion of Mr. Justice Story Enacted as Law Within Thirty–Six Days,* 26 Va.L.Rev. 759, 767 (1940). *See also Michelin Tire Corp. v. United States,* 82 Cust.Ct. 308, 323–28, C.R.D. 79–6, 469 F.Supp. 270, 282–86 (1979) (Watson, J.).

**11.** *See* Act of March 3, 1839, ch. 82, § 2, 5 Stat. 339, 348–49. This enactment can be attributed, in part, to the decision in *Elliott v. Swartwout,* 35 U.S. (10 Pet.) 137, 9 L.Ed. 373 (1836), which held that, if a collector of customs turned over duties to the Treasury with knowledge that they were disputed by the importer, the collector remained liable in an action of assumpsit. The holding derived from the common law governing agents and principals, particularly reasoning from English cases that if an agent were paid money by mistake and apprised of the mistake before paying it over to his principal, he was

personally liable. This rule resulted in collectors' withholding large sums of money paid to them as duties which increased the danger of defalcations and represented a delay in the efficient receipt of revenues by the government. In response, the Act of March 3, 1839 required that all money paid to a collector under protest be turned over promptly to the Treasury and the Secretary would refund any excess duties.

*Carey v. Curtis,* 44 U.S. (3 How.) 236, 11 L.Ed. 576 (1845), held that, by requiring collectors to pay over duties immediately to the Treasury, section 2 had removed the agency rationale for the personal, common-law liability that had existed. That is, "the action for money had and received ... was barred by the Act of Congress of 1839." *Id.* at 252.

**12.** Declaratory Act of Feb. 26, 1845, ch. 22, 5 Stat. 727.

prescribe (and thereby preempt a state) period of limitation for commencement thereof. Neither the 1845 act underlying *Nichols* nor the Act of June 30, 1864, 13 Stat. 214, involved in *Arnson* reflected attempts by Congress to restrict the right to trial by jury. Indeed, not only did the earlier statute provide for such right as quoted above, but the later law continued this right, recited with approval by the Court in *Arnson* [13], as section 3011 of the Revised Statutes as follows:

> Any person who shall have made payment, under protest and in order to obtain possession of merchandise imported for him, to any collector or person acting as collector of any money as duties, when such amount of duties was not, or was not wholly, authorized by law, may maintain an action in the nature of an action at law, which shall be triable by jury, to ascertain the validity of such demand and payment of duties, and to recover back any excess so paid. But no recovery shall be allowed in such action unless a protest and appeal shall have been taken as prescribed in section twenty-nine hundred and thirty one.

While the government concedes, as indicated above, that "an importer could, at one time, obtain a jury trial in an action contesting classification of imported merchandise" [14], it argues that the rule in appraisement cases was quite different, relying on *Hilton v. Merritt*, 110 U.S. 97, 3 S.Ct. 548, 28 L.Ed. 83 (1884), and *Auffmordt v. Hedden*, 137 U.S. 310, 11 S.Ct. 103, 34 L.Ed. 674 (1890). [15]

*Hilton v. Merritt* involved a dispute as to the appraisement of kid gloves imported from France. The case was tried to a jury, which returned a verdict for the collector at the direction of the trial judge. The dispute centered on the value of the gloves. A merchant appraiser had agreed with the importers that the invoice value was correct, while the general appraiser determined the gloves to be worth more. The collector chose to adopt the value contained in the latter's amended report.

In their appeal, the plaintiffs claimed a right to go to the jury on several issues, including whether a full and fair examination of the goods had occurred; whether the invoice reflected the actual value of the goods; and whether the facts in the protest had been established by the evidence. *See* 110 U.S. at 101, 3 S.Ct. at 550. After examining the pertinent statutes, the Court concluded that Congress intended that the appraisement of the customs officers should be final, "but all other questions

---

**13.** *See* 109 U.S. at 241, 3 S.Ct. at 186–87. In *Arnson*, an importer had complied with the requirement that he take an appeal to the Secretary of the Treasury, but no decision issued. The importer brought suit more than seven years later, but it was dismissed by the lower court because it did not meet New York State's six-year statute of limitations for actions upon implied obligations. The Supreme Court held, in effect, that the action was premature; it was not governed by the state statute, and the time for a suit after an adverse decision of the Secretary had not yet started to run. The Court reasoned:

> From this review of the legislation and judicial history of the subject, it is apparent that the common-law action recognized as appropriate by the decision in *Elliott v. Swartwout*, [9 L.Ed. 373], has been converted into an action based entirely on a different principle—that of a statutory liability, instead of an implied promise—which, if not originated by the Act of Congress, yet is regulated, as to all its incidents, by express statutory provisions. And among them are the conditions which fix the time when the suit may begin, and prescribe the period at the end of which the right to sue shall cease. Congress having undertaken to regulate the whole subject, its legislation is necessarily exclusive. 109 U.S. at 243, 3 S.Ct. at 188.

The Court does not suggest from this that, by "converting" the common-law action into one governed by statute, Congress dispensed with the constitutional right to trial by jury in these actions.

**14.** Defendant's Supplemental Memorandum, p. 12, citing as examples *United States v. Kid & Watson*, 8 U.S. (4 Cranch) 1, 2 L.Ed. 531 (1807), and *Merritt v. Tiffany*, 132 U.S. 167, 10 S.Ct. 52, 33 L.Ed. 299 (1889). *See also Pickhardt v. Merritt*, 132 U.S. 252, 10 S.Ct. 80, 33 L.Ed. 353 (1889), and *Greenleaf v. Goodrich*, 101 U.S. (11 Otto) 278, 25 L.Ed. 845 (1880) (jury charge in actions to recover excess duties in classification cases held not in error).

**15.** It is to be noted in passing that the Customs Courts Act of 1970, 84 Stat. 274, eliminated any differential judicial treatment for classification and appraisement issues.

relating to the rate and amount of duties may ... be reviewed in an action at law to recover duties unlawfully exacted."[16]

The other case relied on by the defendant herein, *Auffmordt v. Hedden*, was an appeal by importers from a jury verdict after trial in their favor. They challenged evidentiary rulings of the trial judge regarding appraisal of their merchandise which they claimed minimized their recovery by $42. The Supreme Court sustained the rulings, including those based on a statutory provision that, once a collector decided between any differing viewpoints upon reappraisement, that determination was to be final.

*Badger v. A. Cusimano & Co.*, 130 U.S. 39, 9 S.Ct. 431, 32 L.Ed. 851 (1889), one of the cases referred to in *Auffmordt*, involved the importation of Valencia oranges. After appraisal, the collector had increased the invoice value of the fruit while reducing by an equal amount the invoiced charges for packing and freight, which were not dutiable, and the importer protested. The case was tried pursuant to a stipulation between the parties waiving a jury. Judgment for the plaintiff was affirmed by the Supreme Court upon a rationale that there was

> no impeachment of the appraisement, so far as it states the value of the charges or the value of the goods as increased by the amount of the reduction made from the value of the charges. The only inquiry is, whether the collector acted within the power conferred upon him by statute when he required the importers to pay duties not only upon the actual market value of the goods, but upon such additional value as was equal to the reduction made from the value of the cases covering the goods. These are questions of law simply, involving the power of the collector under the statute. They are entirely apart from any inquiry as to fraud in the appraisement, or as to the values set forth in it, and may be raised by the importer in an action at law, when

he has taken such steps as entitle him to bring suit for the recovery of duties illegally exacted from him. This ruling is entirely consistent with the decision in *Hilton v. Merritt*, 130 U.S. at 43, 9 S.Ct. at 433.

*McCall v. Lawrence*, 15 F.Cas. 1234 (C.C.S. D.N.Y.1855) (No. 8,672), took a similar approach that appraisements are nonreviewable, but pointed out that Treasury instructions to collectors with regard to valuations were not conclusive upon the courts.

In their brief, counsel for the *amicus curiae* claim that "[w]ith the exception of the report of a jury finding of value in *Rankin v. Hoyt*, 45 U.S. (4 How.) 327, 11 L.Ed. 996 (1846) ... we have not found a reported case of merchandise having been tried to a jury after the Act of March 2, 1799". Amicus Brief, pp. 10–11. In that case, the trial judge found for the collector despite a jury's finding that the imported wool was only worth seven and one-half cents per pound and a statute dictating that unmanufactured wool with a value not exceeding eight cents per pound be imported duty free. The plaintiffs argued that they were entitled to judgment on the basis of the jury's special verdict and that, since the appraiser was not authorized to appraise the value of goods in order to determine whether they were dutiable, his appraisement was a nullity.

The Court disagreed, concluding that the statute permitted the use of the appraiser and that the collector was not precluded by the jury finding from following the higher valuation of the appraiser. The *amicus* places emphasis herein on a statement by the Court that

> an appraisal, made in a proper case, must be followed, or the action of the appraisers would be nugatory, and their appointment and expenses become unnecessary. *Tappan v. The United States*, 2 Mason [393], 404. The propriety of following it cannot in such case be impaired by the subsequent verdict of the jury differing from it in amount.... 45 U.S. at 335.

---

**16.** 110 U.S. at 106, 3 S.Ct. at 554. The Court upheld the trial judge's decision not to charge the jury on the issue of full and fair examina-tion, apparently because of a lack of evidence on this claim. *See id.* at 107, 3 S.Ct. at 555.

The Court in *Rankin*, while questioning a jury's duty to value merchandise, upheld the action challenging the collector's right under the law to have an appraisement conducted, and counsel now admit that "questions of whether the appraiser had acted within the parameters of the law were properly reviewable by a Court; to the extent that such matters involved questions of fact, they were presented to a jury". Amicus Brief, p. 22, n. 4, referring to *Greely's Administrator v. Burgess*, 59 U.S. (18 How.) 413, 15 L.Ed. 455 (1855) (holding that the question of whether the merchant appraisers examined at least one package out of every ten packages, as required by law, was one for the jury); and *Heddin v. Iselin*, 142 U.S. 676, 12 S.Ct. 330, 35 L.Ed. 1155 (1892) (holding that the question of whether the merchant appraiser was qualified was properly submitted to the jury). In other words, the correctness of the position espoused by the *amicus curiae* and the defendant, to wit, that plaintiff's jury demand should be stricken, is not shown conclusively by the cases they have brought to our attention.

### D

Point II of Defendant's Memorandum correctly outlines the history to date of judicial review of customs decisions. That history shows that Congress passed the Customs Administrative Act in 1890, 26 Stat. 131, which set up the Board of General Appraisers under the Department of the Treasury to review and decide customs matters. Debate on this legislation reflects concern by some members of Congress that it denied citizens "the Constitutional right of trial by jury".[17] In fact, an earlier proposal to create a special court for the trial of customs cases had been circulated in 1881 which led the collector of Boston to state in a letter to the Secretary of the Treasury that he had "serious doubt whether such legislation would not be unconstitutional, in that it would seem to abridge the rights of the citizen to trial by jury." S.Exec.Doc. No. 48, 47th Cong., 1st Sess. 33 (1881). He noted that "[i]t would also seem to be an encroachment upon the peculiar privilege of the judiciary to finally determine the construction of the law". *Id.*

Indeed, by 1926 the Board of General Appraisers had become the United States Customs Court under Article I of the Constitution.[18] Thereafter, Congress declared that court to be established under Article III. The reports of both judiciary committees in support of the Act of July 14, 1956, ch. 589, 70 Stat. 532, recognized that the

> Customs Court handles cases which very properly come within the judicial power of the United States as set forth in article III, which provides that such judicial power shall extend to controversies to which the United States shall be a party. Thus, there can be no doubt that the Customs Court should be a constitutional Court.[19]

*Accord, Glidden Company v. Zdanok*, 370 U.S. 530, 575, 82 S.Ct. 1459, 1486, 8 L.Ed.2d 671 (1962) (where the Supreme Court, in considering the status of judges of the Court of Customs and Patent Appeals, stated that customs litigation "conforms to conventional notions of case or controversy seems no longer open to doubt").

Notwithstanding this recognition, the government's present view is that the 1890 and subsequent acts are clear reflections of the omnipotence of Congress over such litigation, which entails now, of course, statutory waiver of sovereign immunity. This position has apparently induced our brother in dissent to posit the issue, erroneously in our view, as the constitutionality of those acts. Their constitutionality under Article I is not at issue [20], nor, for that matter, is

---

**17.** 21 Cong.Rec. 811 (Jan. 23, 1890). For a more complete view of the legislative history, see the dissent.

**18.** *See* Act of May 28, 1926, ch. 411, 44 Stat. 669.

**19.** H.R.Rep. No. 2348, 84th Cong., 2d Sess. 1 (1956). *See* S.Rep. No. 1827, 84th Cong., 2d

Sess. 2 (1956) ("The committee is of the opinion that the court more properly should have been so created, and this bill accomplishes this end").

**20.** For example, the constitutionality of the Customs Administrative Act of 1890 was essentially disposed of soon thereafter in *Schoenfeld v.*

the proposition that Congress has the power to constitute tribunals like this Court of International Trade under Article III. Otherwise, it would be appropriate to refer to *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), which held unconstitutional the provision in the Bankruptcy Act of 1978 which established "in each judicial district, as an adjunct to the district court ... the United States Bankruptcy Court". 28 U.S.C. § 151(a) (1976 ed., Supp. IV). In rendering this landmark decision, the Court's lead opinion recognized but "three narrow situations" where "the grant of power to the Legislative and Executive Branches was historically and constitutionally so exceptional that the congressional assertion of power to create legislative courts was consistent with, rather than threatening to, the constitutional mandate of separation of powers." [21] Two of those exceptions, namely, "territorial courts" [22] and "the power to establish and, administer courts-martial" [23], on their face, are not even arguably apposite here. The third encompasses legislative courts and administrative agencies created by Congress to adjudicate cases involving "public rights", as first referred to in *Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. (18 How.) 272, 284, 15 L.Ed. 372 (1856), in the following context:

> ... [W]e do not consider congress can either withdraw from judicial cognizance any matter which, from its nature, is the subject of a suit at the common law, or in equity, or admiralty; nor, on the other hand, can it bring under the judicial power a matter which, from its nature, is not a subject for judicial determination. At the same time there are matters, involving public rights, which may be presented in such form that the judicial power is capable of acting on them, and which are susceptible of judicial determination, but

which congress may or may not bring within the cognizance of the courts of the United States, as it may deem proper.

The lead opinion in *Northern Pipeline* states that this public-rights

> doctrine may be explained in part by reference to the traditional principle of sovereign immunity, which recognizes that the Government may attach conditions to its consent to be sued. See ... also *Ex parte Bakelite Corp.*, 279 U.S. 438, 452, 49 S.Ct. 411, 413–14, 73 L.Ed. 789 (1929). But the ... doctrine also draws upon the principle of separation of powers, and a historical understanding that certain prerogatives were reserved to the political Branches of Government. The doctrine extends ·only to matters arising "between the Government and persons subject to its authority in connection with the performance of the constitutional functions of the executive or legislative department," *Crowell v. Benson*, 285 U.S. 22, 50 [52 S.Ct. 285, 292, 76 L.Ed. 598] (1932), and only to matters that historically could have been determined exclusively by those departments, see *Ex parte Bakelite Corp., supra*, [279 U.S.] at 458 [49 S.Ct. at 416]. The understanding of these cases is that the Framers expected that Congress would be free to commit such matters completely to non-judicial executive determination, and that as a result there can be no constitutional objection to Congress' employing the less drastic expedient of committing their determination to a legislative court or an administrative agency. *Crowell v. Benson, supra*, [285 U.S.] at 50 [52 S.Ct. at 292].

The public-rights doctrine is grounded in a historically recognized distinction between matters that could be conclusively determined by the Executive and Legislative Branches and matters that are "in-

*Hendricks*, 152 U.S. 691, 14 S.Ct. 754, 38 L.Ed. 601 (1894).

**21.** 458 U.S. at 64, 102 S.Ct. at 2868. Two justices, while concurring in the judgment, declined to join the plurality in deciding whether there is a "general proposition and three tidy exceptions." 458 U.S. at 91, 102 S.Ct. at 2882 (Rehnquist, J. concurring).

**22.** *See generally* 458 U.S. at 64–65, 102 S.Ct. at 2868 and the cases cited therein.

**23.** *See generally* 458 U.S. at 66, 102 S.Ct. at 2869 and the cases cited therein.

herently ... judicial." 458 U.S. at 67–68, 102 S.Ct. at 2869 (footnote omitted).

Whether the 1890 and subsequent acts fall within the purview of this doctrine is not entirely clear, although *Murray's Lessee* involved a challenge to the use of a distress warrant issued by the Solicitor of the Treasury against a customs collector to recover revenues withheld by him. The Supreme Court concluded that this procedure was not in conflict with either the Constitution, in particular the due process clause of Amendment V [24], or the settled usages and modes of proceeding inherited from the common and statute law of England.

As shown above, one of those modes of proceeding was an action at law by an aggrieved private party against the collector, which action was triable to a jury. While Congress determined in its Act of March 3, 1839 to require the collector to remit immediately to the Treasury all duties collected, the essence of such actions has remained the same to this day. And since 1956, those actions have been triable in a court constituted by Congress under Article III of the Constitution. In *Northern Pipeline*, the Supreme Court held that, where this article applies, all of the legislative powers specified in Article I are subject to it.[25] Of course, the defendant does not challenge this holding herein but does attempt to raise the shield of its sovereignty. While the nature of our government of the people, by the people and for the people makes its immunity subject to continuous debate, the role of the political branches as determiner of the parameters thereof [26] is not open to discussion other than what the Constitution permits or prohibits.

■ The nature of the action at bar, as it has "emerged from its historical permutations, is still the statutory substitute for the common law action for recovery of duty".[27] When a federal statute embraces a common-law form of action,

> that action does not lose its identity merely because it finds itself enmeshed in a statute. The right of trial by jury in action for debt still prevails whatever modern name may be applied to the action. To hold otherwise would be *to open the way for Congress to nullify the Constitutional right of trial by jury by mere statutory enactments. It is by such methods that courts lose their power to enforce the Bill of Rights.*[28]

Stated another way, since the statutory action "merely codifies" a right that was "known at common law, the right to trial by jury must be preserved." Murphy, *Article III Implications for the Applicability*

---

**24.** The dissent seems to imply that compliance with this clause obviates adherence to other dictates of the Constitution or Bill of Rights. Obviously, this cannot be the case.

Furthermore, the Supreme Court's analysis in *Murray's Lessee* as to why the warrant procedure prescribed by the challenged Act of May 15, 1820 did not entail a denial of due process of law is also persuasive with regard to the contention of the plaintiff herein that trial of penalty actions to a jury under 28 U.S.C. § 1876 but not this action would be a denial of equal protection. *See* Plaintiff's Brief, p. 2, citing *Frederickson v. Luedtke Construction Co.,* 427 F.Supp. 1309, 1315 (W.D.Mich.1977).

**25.** 458 U.S. at 73, 102 S.Ct. at 2872. Apparently, Congress may not "create courts free of Art. III's requirements whenever it finds that course expedient." *Id.* The Court's lead opinion thus rejected the proposition that it

> replace the principles delineated in [its] precedents, rooted in history and the Constitution, with a rule of broad legislative discretion that could effectively eviscerate the constitutional guarantee of an independent Judicial Branch

of the Federal Government. *Id.* at 74, 102 S.Ct. at 2873 (footnote omitted).

**26.** We note in passing that the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1330, 1602–11, reflects the recent intent of Congress "to incorporate into United States law the 'restrictive' theory of sovereign immunity in accordance with international law". *Amerada Hess Shipping Corp. v. Argentine Republic,* 830 F.2d 421, 427 (2d Cir.1987).

**27.** *Michelin Tire Corporation v. United States,* 82 Cust.Ct. 308, 327, C.R.D. 79–6, 469 F.Supp. 270, 285 (1979) (Watson, J.). Duties have long been supplanted by taxes as the primary source of federal revenues under Article I. Since the federal income tax, unlike customs duties, did not exist in 1791, it became necessary for Congress, ultimately, to provide for jury trials of actions against the government for recovery of that tax, 28 U.S.C. § 2402.

**28.** *United States v. Jepson,* 90 F.Supp. 983, 986 (D.N.J.1950) (emphasis added).

*of the Seventh Amendment to Federal Statutory Actions,* 95 Yale L.J. 1459, 1473 (1986).

### E

In *Murray's Lessee v. Hoboken Land & Improvement Co.,* 59 U.S. (18 How.) 272, 280, 15 L.Ed. 372 (1856), the Court sustained the warrant procedure in view of the nonexistence of "some other provision" in the Constitution "which restrains congress". The contention in this action is, of course, that the Seventh Amendment is such a provision.

For its part, the defendant relies on the following *dictum* in *Lehman v. Nakshian,* 453 U.S. 156, 160, 101 S.Ct. 2698, 2701, 69 L.Ed.2d 548 (1981):

> It has long been settled that the Seventh Amendment right to trial by jury does not apply in actions against the Federal Government. In *Galloway v. United States,* 319 U.S. 372, 388–389 [63 S.Ct. 1077, 1086, 87 L.Ed. 1458], the Court observed (footnotes omitted):
>
>> "The suit is one to enforce a monetary claim against the United States. It hardly can be maintained that under the common law in 1791 jury trial was a matter of right for persons asserting claims against the sovereign. Whatever force the Amendment has therefore is derived because Congress, in the legislation cited, has made it applicable."

As indicated in Point I *supra,* the issue in *Lehman* was whether a plaintiff against the federal government under the Age Discrimination in Employment Act was entitled to a jury in the absence of any provision therefor in that statute. Since such an action clearly did not exist at common law, the Court concluded that the Seventh Amendment did not apply. *Galloway* involved a claim for benefits under an insurance policy issued pursuant to the War Risk Insurance Act. The trial judge had granted the government's motion for a directed verdict at the close of the plaintiff's case, and the Court of Appeals affirmed that decision. The plaintiff contended that he had presented sufficient evidence to have his case go to the jury and, thus, the directed verdict deprived him of his right to have the jury decide. On review, the Supreme Court disagreed that the plaintiff had presented sufficient evidence, and it also explained that the Seventh Amendment was inapplicable to cases that were unknown under the common law and that, in any event, trial judges can direct verdicts.

Recently, in *Tull v. United States,* — U.S. ——, 107 S.Ct. 1831, 95 L.Ed.2d 365 (1987), the purview of this amendment was discussed as follows:

> ... The Court has construed [its] language to require a jury trial on the merits in those actions that are analogous to "Suits at common law." Prior to the Amendment's adoption, a jury trial was customary in suits brought in the English *law* courts. In contrast, those actions that are analogous to 18th-century cases tried in courts of equity or admiralty do not require a jury trial. See *Parsons v. Bedford,* [7 L.Ed. 732] (1830). This analysis applies not only to common law forms of action, but also to causes of action created by congressional enactment. See *Curtis v. Loether,* 415 U.S. 189, 193 [94 S.Ct. 1005, 1008, 39 L.Ed.2d 260] (1974).
>
> To determine whether a statutory action is more similar to cases that were tried in courts of law than to suits tried in courts of equity or admiralty, the Court must examine both the nature of the action and of the remedy sought. First, we compare the statutory action to 18th-century actions brought in the courts of England prior to the merger of the courts of law and equity. See, *e.g., Pernell v. Southall Realty,* 416 U.S. 363, 378 [94 S.Ct. 1723, 1731, 40 L.Ed.2d 198] (1974); *Dairy Queen, Inc. v. Wood,* 369 U.S. 469, 477 [82 S.Ct. 894, 899, 8 L.Ed. 2d 44] (1962). Second, we examine the remedy sought and determine whether it is legal or equitable in nature. See, *e.g., Curtis v. Loether,* 415 U.S., at 196 [94 S.Ct. at 1009]; *Ross v. Bernhard,* 396

U.S. 531, 542 [90 S.Ct. 733, 740, 24 L.Ed.2d 729] (1970).[29]

 If this is the proper method for analyzing the action at bar, the conclusion it leads to is the right to a jury trial, for the nature of this action has remained essentially unchanged since the 18th century. While such suits were brought at that time against the king's collector, and not against the king, that subsequent cases in this country were also originally against a collector but later against the United States as titular defendant does not change the consistent, fundamental nature of the disagreement between an importer and a local official over the assessment of merchandise for imposition of duties. From early times to date, these disagreements have been resolvable in courts of law. They have never been tried in either equity or admiralty courts. Furthermore, if, as the Court in *Tull* states, "characterizing the relief sought is '[m]ore important' than finding a precisely analogous common law cause of action in determining whether the Seventh Amendment guarantees a jury trial" [30], the relief sought here shows this to still be an action in debt [31]. In other words, the remedy the plaintiff seeks herein is legal, rather than equitable, in nature.

## CONCLUSION

To summarize, history and the law, as recently elucidated by the Supreme Court in *Tull v. United States*, show that trial by jury remains a fundamental right which applies to an action such as this one, and defendant's motion to strike plaintiff's demand for a jury trial must therefore be denied.

RE, Chief Judge, dissenting.

Fully cognizant of the importance of the right to a trial by jury, and the responsibility of the courts in preserving rights enshrined in the Constitution, I am, nevertheless, constrained to dissent. *See E.E.O.C.*

*v. Corry Jamestown Corp.*, 719 F.2d 1219, 1224 (3d Cir.1983). In sum, I disagree that there is a right to a trial by jury, under the seventh amendment to the Constitution, in an action against the United States for the recovery of customs duties.

Little need be said as to the claim that the right to trial by jury in this action is conferred by the Customs Courts Act of 1980, specifically Title 28 U.S.C. § 1876 (1982). Section 1876 is merely an enabling statute necessary because of the plenary jurisdiction acquired by the court, and the penalty cases arising under 28 U.S.C. § 1582 (1982 & Supp. II 1984) in which the United States is a plaintiff. Section 1876, therefore, simply "sets forth the necessary mechanisms for the court to conduct a jury trial." H.R.Rep. No. 1235, 96th Cong., 2d Sess. 63 (1980), U.S.Code Cong. & Admin. News 1980, pp. 3729, 3775. It neither grants nor confirms any right to a trial by jury in cases against the United States to recover customs duties.

The discussion as to whether there is a right to a jury trial under the seventh amendment to the Constitution appropriately may begin with a reference to the general principle restated by the Supreme Court in the case of *Lehman v. Nakshian*, 453 U.S. 156, 101 S.Ct. 2698, 69 L.Ed.2d 548 (1981). "It has long been settled that the Seventh Amendment right to trial by jury does not apply in actions against the Federal Government." 453 U.S. at 160, 101 S.Ct. at 2701. Hence, when Congress waives the immunity of the United States, a plaintiff has a right to trial by jury only if Congress "has affirmatively and unambiguously granted that right by statute." *Id.* at 168, 101 S.Ct. at 2705.

Significantly, unlike an action for the recovery of customs duties, Congress expressly has provided, "affirmatively and unambiguously," for trial by jury in an action against the United States for the

---

**29.** 107 S.Ct. at 1835 (emphasis in original, footnote omitted).

**30.** 107 S.Ct. at 1837, quoting from *Curtis v. Loether*, 415 U.S. 189, 196, 94 S.Ct. 1005, 1009, 39 L.Ed.2d 260 (1974).

**31.** In *Tull*, the Court concluded that that action under the Clean Water Act was "clearly analogous to the 18th-century action in debt". 107 S.Ct. at 1836.

recovery of internal revenue taxes. *See* 28 U.S.C. § 2402 (1982).

Furthermore, as in this action, to enforce a monetary claim against the United States, the Supreme Court indicated, in *Galloway v. United States*, 319 U.S. 372, 63 S.Ct. 1077, 87 L.Ed. 1458 (1943):

> The suit is one to enforce a monetary claim against the United States. It hardly can be maintained that under the common law in 1791 jury trial was a matter of right for persons asserting claims against the sovereign. Whatever force the Amendment has therefore is derived because Congress, in the legislation cited, has made it applicable.

*Id.* at 388–89, 63 S.Ct. at 1086 (footnotes omitted).

More specifically, in suits against the United States involving the collection of taxes, such as customs duties, the Supreme Court has emphasized that the taxpayer does not have a right to trial by jury under the seventh amendment. For a unanimous Supreme Court in *Wickwire v. Reinecke*, 275 U.S. 101, 48 S.Ct. 43, 72 L.Ed. 184 (1927), Chief Justice Taft wrote:

> It was suggested, in the brief for the United States in resisting the application for certiorari, that the assignment of error made on behalf of the petitioner was inadequate in that it was not based on a reference to the Seventh Amendment to the Constitution requiring a jury trial in a civil case involving more than twenty dollars. This objection has not been renewed in the brief on the merits, *doubtless because the right of the petitioner to a jury in such a case is not to be found in the Seventh Amendment to the Constitution* but merely arises by implication from the provisions of § 3226, Revised Statutes, which has reference to a suit at law. *It is within the undoubted power of Congress to provide any reasonable system for the collection of taxes and the recovery of them when illegal, without a jury trial —if only the injunction against the taking of property without due process of law in the method of collection and protection of the taxpayer is satisfied.*

*Murray's Lessee v. Hoboken Land and Improvement Co.*, 18 How. 272, 281, 282, 284 [15 L.Ed. 372]; *Nichols v. United States*, 7 Wall. 122, 127 [19 L.Ed. 125]; *Cheatham v. United States*, 92 U.S. [ (2 Otto) ] 85, 88, 89 [23 L.Ed. 561].

*Id.* at 105–06, 48 S.Ct. at 44–45 (emphasis added).

Reliance upon the case of *Tull v. United States*, —— U.S. ——, 107 S.Ct. 1831, 95 L.Ed.2d 365 (1987) to support the demand for a jury trial in this action against the United States is misplaced. The *Tull* case was an action brought by the United States to recover potential civil penalties of about $23 million. The case did not arise from the laws enacted by Congress for the collection of taxes, but was brought by the United States seeking civil penalties against an individual for the alleged violation of the Clean Air Act. *Tull*, 107 S.Ct. at 1833–34. In *Tull*, the court noted that a civil penalty at common law was recoverable in courts of law, and stated that "[r]emedies intended to punish culpable individuals, as opposed to those intended simply to extract compensation or restore the status quo, were issued by courts of law, not courts of equity." *Id.* at 1838. Apart from the helpful discussion of the importance of the remedy sought, *Tull* does not support a claim for a jury trial in a monetary action against the United States to recover customs duties allegedly illegally exacted.

The claimed seventh amendment right to a jury trial in this action apparently is predicated upon the fact that, in the early years of our nation, there existed a common law right of action against a collector of customs, with a concomitant right to a trial by jury, to recover excessive customs duties. Starting in 1839, Congress enacted a series of statutes in which the common law cause of action was eliminated, and various statutory remedies were substituted in its place, culminating, in 1890, with a statutory remedy that had no provision for jury trials.

Accordingly, the question presented is whether the legislation of Congress, which did not provide for trial by jury in actions

against the United States to recover customs duties alleged to be illegally exacted, is constitutional. In my opinion, that legislation is constitutional and valid.

The early tariff laws provided no statutory system for judicial review of determinations made by the collectors of customs. However, when a collector of customs exacted excessive or illegal duties, by application of common law principles, the collector was personally liable to the importer for the amount illegally exacted.

Although, at that time, the federal courts did not have jurisdiction over those common law actions, it was possible for a collector, sued at common law in a state court, to set up a defense of federal authority, and remove the case into a federal court. *See* Act of Mar. 3, 1817, ch. 109, 3 Stat. 396.

The determinations of the collectors of customs as to the rate and amount of duties (classification issues) were judicially reviewed on common law principles. *See Elliott v. Swartwout,* 35 U.S. (10 Pet.) 137, 150, 9 L.Ed. 373 (1836). These common law actions, preferably brought in assumpsit, were the only remedies available to a person who sought to challenge administrative interpretations and applications of the tariff laws.

The personal liability of a collector of customs in an action in assumpsit was based upon the implied promise of the collector to repay the excessive amount collected. Hence, the practice developed that the collectors of customs retained large sums of money to indemnify themselves from any liability for duties paid under protest, and thus did not pay over to the Treasurer of the United States the disputed amounts until the litigation was terminated.

In 1839, Congress passed the first statute regulating disputes involving the classification of imports. *See* Act of Mar. 3, 1839, ch. 82, § 2, 5 Stat. 339, 348–49. The law required the collectors of customs immediately to place all moneys collected by them to the credit of the Treasurer. That law also made the Secretary of the Treasury the final arbiter for examining and determining claims for refunds of duties paid under protest to the collectors. The 1839 law made no provision for judicial review of the Secretary's determinations.

In 1845, the Supreme Court, in the case of *Cary v. Curtis,* 44 U.S. (3 How.) 236, 11 L.Ed. 576 (1845), sustained the constitutionality of the Act of Mar. 3, 1839, and held that, by removing the ground or basis for the collector's implied promise to repay, Congress took away from the importer the previously existing common law right of action against the collector. 44 U.S. (3 How.) at 251–52, 11 L.Ed. 576. In separate dissents, Justices Story and McLean expressed their views that the law, as interpreted by the majority, was unconstitutional.

Soon after the *Cary* decision, Congress passed the explanatory Act of Feb. 26, 1845, ch. 22, 5 Stat. 727, "which, by legislative construction of the Act of 1839, restored to the claimant his right of action against the collector...." *Arnson v. Murphy,* 109 U.S. 238, 241, 3 S.Ct. 184, 186, 27 L.Ed. 920 (1883).

In an 1864 law, Congress continued to allow a right of action against the collector, but conditioned that right upon an appeal from the collector's determination to the Secretary of the Treasury, and further provided that the action against the collector could not be brought until after the appeal to the Secretary was decided, or not acted upon, within a specified time. *See* Act of June 30, 1864, ch. 171, §§ 14, 15, 13 Stat. 214–15.

In *Arnson v. Murphy,* the Supreme Court recognized that the effect of the 1864 Act was to repeal the Act of Feb. 26, 1845, and that the action against the collector of customs, after 1864, was, "converted into an action based entirely on a different principle—that of a statutory liability, instead of an implied promise—which if not originated by the Act of Congress, yet is regulated, as to all its incidents, by express statutory provisions." *Arnson,* 109 U.S. at 243, 3 S.Ct. at 188. The Supreme Court stressed that "Congress having undertaken to regulate the whole subject, its legislation is necessarily exclusive." *Id.; see also*

*De Lima v. Bidwell,* 182 U.S. 1, 178, 21 S.Ct. 743, 746, 45 L.Ed. 1041 (1901).

The statutory right of action against a collector, including the statutory right to trial by jury, continued until 1890. In that year, by the Customs Administrative Act of 1890, ch. 407, 26 Stat. 131, Congress consciously, deliberately, and with full awareness of its constitutional implications, repealed the statute allowing an action against a collector, with its concomitant statutory right to trial by jury before the courts. In 1890, as explained below, Congress substituted a "radically" new statutory system for an action against the United States before a newly established Board of General Appraisers. The new system intentionally removed the right to a jury trial before the courts, and "substituted" a trial before the general appraisers.

The Board of General Appraisers and the new statutory system were intended to provide better administrative control necessary to implement the complete overhaul of the tariff system brought about by the McKinley Tariff Act, ch. 1244, 26 Stat. 567, also enacted in 1890. Congress recognized that the prior system resulted in differing and conflicting tariff law interpretations by courts and juries throughout the country which created undue delay, doubts and difficulties in the collection of the country's revenues. By the Customs Administrative Act of 1890, after 100 years of experience with other methods, Congress removed from the ordinary courts litigation over tariff law interpretation. To achieve uniformity, Congress expanded the power of the general appraisers to decide the technical problems inherent in the classification and valuation of imported merchandise. *See generally* F. Frankfurter & J. Landis, *The Business of the Supreme Court* 149 (1928).

The statutory antecedents and applicable Supreme Court decisions, including *Cary v. Curtis,* were, of course, well known to the Congress in the deliberations and debates which led to the enactment of the 1890 law.

This Congressional awareness is made clear by the following excerpt from the Report of the House Committee on Ways and Means, which quoted the Senate Committee Report:

*It will be seen that the proposed sections are a radical departure from the existing law.* They substitute for the decision of the Secretary of the Treasury, in all cases of appeal upon questions of classification and rate of duty and upon questions as to fees, charges, and exactions, the decision of the board of appraisers provided for in the preceding section, *and confer upon said board in the first instance exclusive jurisdiction of all said questions.* They confer upon the several circuit courts of the United States appellate jurisdiction upon all questions of law as respects classification and rate of duty, with a final determination by the Supreme Court of the United States in difficult cases, or in cases where the Attorney–General shall be of opinion that the matter in controversy should be appealed thereto.

. . . .

Previous to 1839 a person paying duties claimed by him to have been illegally exacted had a common-law right of action against the collector to whom the payment had been made, provided the person making such payment gave notice at the time of payment that the duties charged were too high, and that the party paying so paid in order to secure possession of his merchandise, and that he intended to sue to recover back the amount so erroneously paid, and provided that he also gave notice to the collector not to pay over the amount into the Treasury. Collectors of customs being thus personally liable, it was their practice to retain large sums of money in their possession on the ground that it had been paid under protest, and that they must indemnify themselves against liability. This evil of retention of moneys by collectors became so marked that by the second section of the act of March, 1839, all moneys were required to be paid into the Treasury.

*It was held by the Supreme Court in the case of Carey [sic] vs. Curtis (3 Howard, page 236) that this act de-*

*prived the importer of all right of action in the courts for duty erroneously or illegally exacted from him.* This decision of the court, therefore, left him no remedy but an appeal to the Secretary of the Treasury, who was authorized, whenever it was shown to his satisfaction in any case of unascertained duties, etc., to refund such overpayment. It thus being held that the importer was excluded by this act from commencing suit at common law, Congress, on the 26th of February, 1845 (vol. 5, Stat. at Large, page 727), provided that nothing in the act should be construed to take away or impair the right of any person or persons to maintain a suit at common law.

*And this provision continued in force until June 30, 1864, when the sections, 2931 and 2932, were enacted, since which time importers have been compelled to resort to the statutory remedy therein provided, and by said sections the common law remedy which existed up to that time was taken away*
. . . .

. . . .

It is believed that the proposed sections will afford claimants a speedy, just, and efficacious remedy. The tribunal in the first instance will be composed of officers selected with a view to their peculiar fitness and qualifications for the duties devolving upon them. Their time and attention will be given exclusively to a study of the tariff laws and to their practical application, and they could readily hear and dispose of the cases as they might arise in an intelligent and satisfactory manner; but if they shall make a mistake as respects the true construction of the statutes relating to classification and rate of duty, a speedy and efficacious remedy is provided for a review of their decisions as respects the law of the case, their finding of facts being conclusive upon the Government and the importer.

H.R.Rep. No. 6, 51st Cong., 1st Sess. 7–8 (1980) (emphasis added).

One of the principal features of the 1890 legislation, as proposed by its leading congressional sponsor, Congressman (later President) William McKinley, then Chairman of the House Committee on Ways and Means, was the provision for the appointment of a board of nine general appraisers, before whom trials would be conducted.

When the House convened as a Committee of the Whole to consider the bill, there was vigorous opposition to the McKinley proposal, much of which focused upon the fact that the new system would take away from the importer, in a classification case, the right to a trial by jury against a collector of customs. 21 Cong. Rec. 825 (1890). Although acknowledging that the right of trial by jury as to questions of fact would be taken away, the proponents explained that "there is a substitute for the jury in the nine appraisers...." *Id.*

During the debate in the House, the focus shifted to the Act of Mar. 3, 1839, *Cary v. Curtis,* and the explanatory Act of Feb. 26, 1845. The proponents, relying upon the Supreme Court opinion in *Cary,* maintained that the proposed new system was not constitutionally defective in that:

Congress, [as] the legislative branch of the Government, was supreme in its power of levying and collecting taxes, and that if they allowed a suit in any case it was only an act of clemency and beneficence on the part of the Government; that they need not allow any claim for redress, *but they might make the Secretary of the Treasury the supreme tribunal in the case, both as to the law and as to the facts, and take away entirely the right of trial by jury.*

*Id.* at 818–19 (emphasis added).

After three days of extensive consideration by the House, Chairman McKinley summarized the position of the proponents as it pertained to the right to trial by jury:

Mr. McKINLEY. Mr. Chairman, I had intended to cite some authorities on the constitutional question raised on the fifteenth section; but I understand from the discussion this morning that that position has been abandoned and *that no gentlemen now seriously questions the constitutional right of Congress to enact the legislation proposed in the bill*

*under consideration. The question, therefore, has rather drifted to one of public policy—whether it is fair, just, and necessary to create a board of general appraisers, with the powers granted in the section under debate, and to deprive, as it is said, the importer of the right of trial by jury.*

*Id.* at 833 (emphasis added).

Congress, in the 1890 law, specifically repealed section 3011 of the Revised Statutes of the United States (1878), which authorized trial by jury, in actions against a collector of customs. *See* Customs Administrative Act of 1890, ch. 407, § 29, 26 Stat. 131, 141–42. Furthermore, Congress relieved the collectors of any personal liability resulting from a determination as to the classification or rate of duty of imported merchandise. *See* Customs Administrative Act of 1890, ch. 407, § 25, 26 Stat. 131, 141; *see also* H.R.Rep. No. 6, 51st Cong., 1st Sess. 10.

In repealing section 3011 of the Revised Statutes, Congress removed the jurisdiction from the federal courts, to hear suits against the collectors, and conferred jurisdiction upon the Board of General Appraisers to review determinations of the collectors, with a further review in the circuit courts. *See Glidden Co. v. Zdanok*, 370 U.S. 530, 575, 82 S.Ct. 1459, 1485–86, 8 L.Ed.2d 671 (1962).

The legislative history of the Customs Administrative Act of 1890 leads me to the inescapable conclusion that the Congress carefully considered the question of the importer's right to a jury trial in an action for the refund of customs duties, and that it examined fully and completely the constitutional and policy arguments against eliminating that right. It is beyond doubt that Congress concluded that there was no constitutional bar to removing the right to trial by jury. In clear and unambiguous terms, Congress intentionally and deliberately chose to eliminate jury trials in actions against the United States to recover excessive or illegal customs duties.

The Customs Administrative Act of 1890 was interpreted and applied by the Supreme Court in the case of *Schoenfeld v.*

*Hendricks*, 152 U.S. 691, 14 S.Ct. 754, 38 L.Ed. 601 (1894). The Supreme Court held that after the 1890 law no action could be maintained against a collector of customs either at common law or under the statutes of the United States, since the remedy given by the 1890 statute through the Board of General Appraisers was exclusive. *Schoenfeld*, 152 U.S. at 692–93, 14 S.Ct. at 755. Also, it was clear to the Supreme Court, in *United States v. Ranlett & Stone*, 172 U.S. 133, 19 S.Ct. 114, 43 L.Ed. 393 (1898) that: "[t]he remedies provided by the Act of June 10, 1890, furnish the equivalent for the action against the collector which was originally the remedy for an illegal exaction of duties...." 172 U.S. at 145–46, 19 S.Ct. at 118.

It is not necessary here to trace the subsequent statutory evolution of the Board of General Appraisers to today's Article III United States Court of International Trade. *See* Re, *Litigation Before the United States Court of International Trade*, 19 U.S.C.A. §§ 1 to 1300 (West Supp. 1988). Nevertheless, it is important to note that this court possesses "all the powers in law and equity of, or as conferred by statute upon, a district court of the United States," 28 U.S.C. § 1585 (1982); and, the court will make its determination in this action *de novo*, "upon the basis of the record made before the court," 28 U.S.C. § 2640 (1982).

It is crystal clear, therefore, that Congress removed one form of statutory remedy and substituted another with procedures which today fully meet the requirements of due process. The fact that the existing remedy does not include, and has not included since 1890, a provision for trial by jury, does not render the existing remedy and its procedures unconstitutional.

Of course, this action does not present a claim that Congress has withdrawn from any judicial review a cause of action which was the subject of a suit at common law. There is a vast difference between the total denial of any remedy, and the substitution of another statutory remedy for one that previously existed. As Professor Hart con-

cluded: "It must be plain that Congress necessarily has a wide choice in the selection of remedies, and that a complaint about action of this kind can rarely be of constitutional dimension." *See*, Hart, *The Power of Congress to Limit the Jurisdiction of Federal Courts: An Exercise in Dialetic*, 66 Harv.L.Rev. 1362, 1366 (1953). Furthermore, the power of Congress to regulate the jurisdiction of the federal courts, and to determine the remedies they may afford, has long been recognized by the Supreme Court. *See Ex parte McCardle*, 74 U.S. (7 Wall.) 506, 513, 19 L.Ed. 264 (1869).

On this question, the Supreme Court's opinion in *Anniston Mfg. Co. v. Davis*, 301 U.S. 337, 57 S.Ct. 816, 81 L.Ed. 1143 (1937) is particularly instructive. In that case, plaintiff alleged the unconstitutionality of a statute which took away a statutory right of action against the collector of internal revenue and substituted a different statutory action directly against the United States. *Anniston*, 301 U.S. at 341–42, 57 S.Ct. at 818. The Supreme Court agreed with the government's statement that the Court was not presented with the question of " 'the power of Congress to withdraw suit entirely, both against the Collector and against the Government....' " *Id.* at 342, 57 S.Ct. at 818. In upholding the constitutionality of the new statutory remedy, Chief Justice Hughes wrote:

> The Government has not denied its obligation to refund the amounts found in the authorized proceeding to be recoverable, but has recognized that obligation. *In such a case, the substitution of an exclusive remedy directly against the Government is not an invasion of constitutional right.* Nor does the requirement of recourse to administrative procedure establish invalidity if legal rights are still suitably protected. *The immediate question is whether the authorized proceeding affords a fair and adequate remedy.* We accordingly inquire whether the prescribed procedure gives an opportunity for a full and fair hearing and determination of all questions of fact

and adequately provides for the protection of the legal rights of the claimant, embracing whatever right of refund the claimant is entitled to assert under the Federal Constitution.

*Id.* at 343, 57 S.Ct. at 819 (emphasis added).

The teaching of *Anniston* applies perforce to this case. Congress has not denied any obligation by the Government to refund excessive or illegally exacted customs duties. Instead, Congress established an exclusive and effective remedy against the United States, in place of a previous common law, and later statutory, right of action against the collectors of customs. Accordingly, the question here, as in *Anniston*, is not the power of Congress to remove a cause of action entirely, but rather "whether the authorized proceeding affords a fair and adequate remedy." *See id.* As in *Anniston*, in this case, the existing procedures, established by Congress, before this court provide a claimant against the United States with "an opportunity for a full and fair hearing and determination" of all questions of fact and issues of law. In these suits against the United States, Congress has authorized a statutory remedy which is more effective and complete than any which existed at common law.

To conclude that the plaintiff in this action against the United States is entitled to a jury trial under the seventh amendment, this court must hold that the Customs Administrative Act of 1890 was unconstitutional solely because Congress did not provide for trial by jury. The court would have to conclude that the Supreme Court was wrong in *Cary*, and that the Act of Mar. 3, 1839 was unconstitutional. The court would also have to question the constitutionality of the Customs Courts Act of 1970, and the Customs Courts Act of 1980, neither of which provided for trial by jury in these actions. For the reasons stated, I am not persuaded that those determinations should be made.

Since I am of the opinion that plaintiff, in this action against the United States, does not have a right to a jury trial under the

seventh amendment, or applicable statutes, I would grant the defendant's motion to strike plaintiff's demand for a jury trial.

Pursuant to 28 U.S.C. § 1292(d)(1) (1982), since I believe that a controlling question of law is involved, with respect to which there is substantial ground for difference of opinion, and that an immediate appeal from this order may materially advance the ultimate termination of this litigation, I would also certify the question for immediate appeal to the United States Court of Appeals for the Federal Circuit.